WILLIAM J. CHITTENDEN v. HARRIET E. WITBECK.

*Partnership—Delay in settlement—Good-will— Use of property after death of partner—Judicial notice.*

Delay in a partnership settlement between the survivor and the representatives of a deceased partner cannot properly be charged against either party where their mutual negotiations are constantly progress· ing and fail without manifest want of good faith on either side.

A surviving partner has no authority to set off any definite portion of the firm assets to the representative of the deceased partner and retain some other definite portion for himself unless by some act to which the representative becomes a consenting party. Nor can he, in fairness, exclude the latter from participation in the assets so far as the latter has occasion to use them.

When a partnership has taken a lease which has expired, but for the renewal of which negotiation are pending, *it seems* that it is not wrong that one of the partners should arrange with the lessor for his own continuance as lessee in case the partnership should come to an end by dissolution, or by the death of the other party.

Partnerships are for the mutual advantage of all the members, and all are to have the benefit of the advice, assistance, and responsibility of their associates and while they share the profits are also to share the losses.

Partnerships are founded in and must repose on mutual confidence and trust; partners are general agents for each other in the business, and where the association is terminated by the death of one, his representative cannot, of right, demand admission in his place.

Good-will is the favor which the management of a business wins from the public, and the probability that old customers will continue their patronage. But it attaches to the property, and in the case of a lease belongs to the lessee only during its continuance, and on its expiration reverts to the lessor; and in fixing rent the lessor can take it into the account as giving the property a part of its value.

The survivor of a firm of hotel keepers continued temporarily to use the furniture belonging to the firm, in carrying on the business, after the death of his partner. The latter's representative protested against its continued use, but enjoined its removal from the premises. *Held* that the survivor could not be required to account to his deceased partner's estate for profits from the business, during his continued use of the furniture under such circumstances, and that he was liable

only for its deterioration and destruction while so used, and for interest on the amount.

An appellate court can take notice of facts in a record before it in deciding another case with which they are involved.

The survivor of two partners is not to be charged in behalf of the decedent's estate as for gains or losses resulting to the business from changes or improvements which had been entered upon with the consent and at the expense of both, but which one did not live to obtain the benefit of.

Cross-appeals from the Superior Court of Detroit. (Chipman, J.) April 17—April 25.

BILL to close up claims made by defendant against complainant. Both parties appeal. Decree affirmed with modifications.

*Charles A. Kent* for complainant. After dissolution of a partnership at will, which would take place on the appointment of a guardian for an insane partner, the latter could not be bound by any act of the other partner : Comp. L. § 4824 ; Pars. on Partnership § 463 ; Story on Partnership § 303 ; Colly. Part. § 109, n. 5 ; and the acts of an insane person are void : *Sewing Machine Co. v. Barnard* 43 Mich. 379 ; *Dexter v. Hall* 15 Wal. 9 ; if the survivor has acted illegally, but not fraudulently, the value of his services is allowed to him before any division of the profits, on the principle that where there is no fraud or breach of trust the surviving partner should be compelled to pay only what he has actually received from the assets retained, and of course any part of the profits derived from his personal services cannot have come from such assets : 2 Lind. Part. 983 ; *Brown v. De Tastet* Jac. 284, 623 ; *Featherstonhaugh v. Turner* 25 Beav. 382 ; *Mellersh v. Keen* 27 Beav. 242 ; the difficulties arising out of the doctrine of giving profits to the representatives of a deceased partner are stated by Lord Eldon in *Crawshay v. Collins* 2 Russ. 342–347 ; he insists that each case must stand on its own merits : *Willett v. Blanford* 1 Hare 253–269 ; *Yates v. Finn* L. R. 13 Ch. Div. 842 ; the surviving partner was allowed compensation for

conducting the business after dissolution, though he is not entitled to such compensation for merely winding up the business: *Cameron v. Francisco* 26 Ohio St. 190 ; *Griggs v. Clark* 23 Cal. 427; in *Hyde v. Easter* 4 Md. Ch. 80 it was held that, under the circumstances of that case, a surviving partner carrying on the business was not obliged to account to the representatives of the deceased for any share of the profits ; the doctrine that the surviving partner and representatives of the deceased are tenants in common is laid down in Parsons on Partnership § 440, and Story on Partnership § 346; and is somewhat qualified in Michigan by *Pfeffer v. Steiner* 27 Mich. 538.

*Henry M. Duffield, Don M. Dickinson* and *C. I. Walker* for defendant. A surviving partner is bound to keep the decedent's representative fully informed of the condition of all the firm assets, and in dealing with a woman not thoroughly familiar with such matters he is bound to use additional care to prevent her from being imposed upon, and to pay over to the decedent's estate as fast as realized its share of all money not needed to pay debts: *Heath v. Waters* 40 Mich. 457; but he cannot purchase the property of the firm at an appraised price: *Burdon v. Barkus* 4 De Gex, F. & J. 42 ; Lind. on Part. (4th ed.) 1015, 1040, 1046 ; Pars. on Part. §§ 441, 445 ; Story on Partnership, § 351; each partner can insist upon a sale: *Wild v. Milne* 26 Beav. 504 ; *Rowlands v. Evans* 30 Beav. 302 ; but neither has a right to have the value of his own or any co-partner's share determined by valuation, or to have the partnership property, or any part of it, divided in specie : Lindl. Part. 1015, 1040; *Rigden v. Pierce* 6 Madd 353 ; nor can either partner bid at a sale : Lindl. Part. 1017 ; the decedent's representative has the right to an accounting from the survivor for the profits obtained in the employment of the assets up to the time of closing the account: Lindl. Part. 982, 1046 ; *Brown v. De Tastet* Jac. 284 ; *Featherstonhaugh v. Turner* 25 Beav. 382; Story on Part. § 349 ; Parsons on Partnership 443 ; Colly. Part. 324; in *Booth v. Parks* 1 Moll. 465, a survivor who continued the business was held liable

for profits; in *Goodburn v. Stevens* 5 Gill (Md.) 1, the administrator of a deceased partner had the right to demand either the actual profits made by the survivors from the use of decedent's share in the partnership property or interest on the capital thus employed; and the right to elect has existed in Michigan since *Millard v. Ramsdell* Har. Ch. 373; in *Featherstonhaugh v. Fenwick* 17 Ves. 298, two partners having obtained in their own names a renewal of the lease of the partnership premises dissolved the partnership and sought to exclude the plaintiff, their co-partner, from all interest in the new lease; but in taking the accounts of the partnership, the new lease was treated as part of the assets of the firm; in *Clegg v. Fishwick* 1 Macnagh. & G. 294, plaintiff who was administratrix of one of several partners in a coal mine, filed a bill against the surviving partners for an account and a dissolution, and for a declaration that a renewed lease which had been obtained by the defendants, be subjected in equity to a trust for the benefit of the partnership; one of the defences was that the old partnership ended with the old lease and that plaintiff could not therefore claim any interest in the new lease; *held* that the old lease was the foundation for the new one and that partners interested with others in the lease could not take the benefit of a renewal to the exclusion of those others; in *Clegg v. Edmondson* 8 De Gex, MacNaghten & Gordon 787, the partnership was at will and the managing partners gave notice of dissolution and of their intention to renew the old lease for their own benefit but it was done so against the protest of the other partners and it was *held* that it was not proper for the managing partners to acquire for themselves alone the benefit of the renewed lease; if a partnership have valuable leasehold property, and when it is about to expire a partner privately gets it renewed to himself, he is held to have obtained it for his partner as well: *Dougherty v. Van Nostrand* 1 Hoff. Ch. 68; *Leach v. Leach* 18 Pick. 76; *Washburn v. Goodman* 17 Pick. 519; in New York the doctrine prohibiting the renewal of a partnership lease for the benefit of one partner was carried to such an extent, in the case of a part-

nership engaged in the hotel business, that an absolute purchase by one partner of the real estate leased by the firm was held to be made by the purchaser as trustee for the benefit of the firm : *Anderson v. Lemon* 4 Seld. 236 ; *Clements v. Hall* 2 De G. & J. 173 ; *Alder v. Fouracre* 3 Swanst. 489 ; it is every partner's duty to use the firm property for the firm's benefit : *Honore v. Colmesnil* 1 J. J. Marsh. 507, 541 ; if a partner by any means gets possession of a fund properly belonging to the firm, he must share any profit or advantage arising from it with his co-partner : *Eason v. Cherry* 6 Jones Eq. 261 ; if a partner for his own benefit makes any private bargain with third persons which injures the partnership or gives him an advantage which belongs to all in common, he must make compensation to the partnership somehow : Pars. Partnership 226; *Fawcett v. Whitehouse* 1 Russ. & Myl. 135 ; *Hichens v. Congreve* id. 150 ; *Holridge v. Gillespie* 2 Johns. Ch. 30 ; *Struthers v. Pearce* 51 N. Y. 357 ; *Mitchell v. Read* 61 N. Y. 123 : 84 N. Y 556 ; a surviving partner cannot be allowed compensation for his services in closing up partnership matters : *Burden v. Burden* 1 Ves. & B. 170 ; *Stocken v. Dawson* 6 Beav. 371 ; *Beatty v. Wray* 19 Penn. St. 519 ; *Lyman v. Lyman* 2 Paine 52 ; *O'Reilly v. Brady* 28 Ala. 530 ; *King v. Hamilton* 16 Ill. 190 ; *Roach v. Perry* id. 37 ; *Cooper v. Reid* 2 Hill (S. C. Eq.) 549 ; *Cooper v. Merrihew* Riley Eq. 166 ; *Hite v. Hite* 1 B. Mon. 177 ; Story on Partnership (6th ed.) § 331 ; *Ogden v. Astor* 4 Sandf. 311 ; where the accounts of a partnership are not settled a surviving partner who employs the property of the decedent in carrying on the business cannot oppose an accounting if it can be taken without incurring difficulties which might so far embarrass the firm as to make it unjust : *Docker v. Somes* 2 M. & K. 655 ; *Cook v. Collingridge* Jac. 607 ; good will is that species of connection in trade which induces customers to deal with a particular firm, and it is part of the assets : *Willett v. Blanford* 1 Hare 253 ; *Wedderburn v. Wedderburn* 22 Beav. 104 ; *Bradbury v. Dickens* 27 Beav. 53 ; *Mellersh v. Keen* id. 236 ; *Steuart v. Gladstone* L. R. 10 Ch. Div. 626,

652; *Hall v. Barrows* 4 De. G. J. & S. 151; *Marten v. Van Schaick* 4 Paige 480; *Williams v. Wilson* 4 Sandf. Ch. 380; *Skidmore v. Collier* 15 N. Y. Sup. 51; *Cameron v. Francisco* 26 Ohio St. 190; *Sheppard v. Boggs* 9 Neb. 257; *Holden v. M'Makin* 1 Parsons' Sel. Eq. Cas. 270; but see *Hammond v. Douglas* 5 Ves. 539; *Lewis v. Langdon* 7 Sim. 421; *Farr v. Pearce* 3 Madd. 47; a surviving partner, though entitled to the possession of the partnership property is a mere trustee so far as the interests of the estate of the deceased partner are concerned and he should, without unnecessary delay settle the affairs of the partnership and dispose of the property, convert it into money, pay the debts and distribute it to the parties in interest : Parsons on Partnership 440; *Forrester v. Oliver* 1 Ill. App. 259; *Nelson v. Hayner* 66 Ill. 493; *Skidmore v. Collier* 15 N. Y. Sup. 50, 54; *Barry v. Briggs* 22 Mich. 206; *Moore v. Huntington* 17 Wall. 423; and he is not entitled to compensation for his services in doing so: *Brown v. McFarland* 41 Penn. St. 129; *Brown's Appeal* 89 Penn. St. 147; *Ames v. Downing* 1 Bradf. 334; *Sterne v. Goep* 20 Hun 396; *Schenkl v. Dana* 118 Mass. 236; *Nelson v. Hayner* 66 Ill. 487; *Kimball v. Lincoln* 5 Ill. App. 316; *Van Duzer v. McMillan* 37 Ga. 311; *Smith v. Walker* 38 Cal. 388; *Heath v. Waters* 40 Mich. 465; *Godfrey v. White* 43 Mich. 181–2; *Starr v. Case* 13 N. W. Rep. 645; where the surviving partner uses the capital belonging to the deceased partner in carrying on the business, he does this at his own risk, and the representative of the deceased partner may either demand a proper proportion of the profit made by the business, or the value of the capital thus used together with the interest: Pars. Part. 443; Lindl. Part. 868; *Willet v. Blanford* 1 Hare 265, 269; *Case v. Abeel* 1 Paige 393; *Forrester v. Oliver* 1 Ill. App. 259; *Brown's Appeal* 89 Penn. St. 139, 147.

COOLEY J.   This suit involves the adjustment of partnership affairs after the decease of one of the partners.

The partnership consisted of the complainant and Charles S. Witbeck.   It was formed for the purpose of carrying on

the hotel business in the Russell House, in the city of Detroit, which was leased by them in the year 1864. There were never any written articles of copartnership, nor was any period fixed for the duration of the firm. Each partner was equally interested in the business. The Russell House, when they leased it, belonged to Dr. E. M. Clark, who died in the year 1871, leaving a will which made Ashley Pond, James E. Pittman and James A. Brown executors and trustees of the estate. Mrs. Clark, now Mrs. Lane, survived him, as did also two children, William B. and Frank H., the younger of whom, Frank H., would attain his majority March 17, 1883, at which time the trust was to terminate, and the control of the estate pass to the widow and sons. The lease of the Russell House to the partnership expired February 1st, 1881. The lessees, nevertheless, continued in possession after that time as before, and paid the same rent. During the spring of 1881, negotiations were opened between the lessees on the one side, and Mr. Pond, representing the trustees, on the other, which contemplated the making of extensive changes in the hotel and a new lease for some considerable period at a largely increased rent. An agreement respecting the changes was arrived at, and they were of a nature to interfere very considerably with the business of the hotel, while not requiring a suspension. A proposed lease was also reduced to writing, which in its main features had the assent of Mr. Pond and William B. Clark, but was not submitted to Mrs. Lane or Frank H. Clark, and they were ignorant of it. It was assumed, however, that they would also assent without question. The draft was prepared with the concurrence of complainant and of Witbeck, but whether in all its provisions it had the assent of Witbeck is disputed. The executors and trustees were named as lessors, and Witbeck and Chittenden as lessees, and it was to cover the period from its execution until Frank H. Clark should come of age, when, as above stated, the management of the estate would pass out of the hands of the trustees. The rent to be paid was twelve hundred and fifty dollars per month, and a further sum equal

to six and one-half per centum on the cost of the agreed improvements when they should be completed. Certain sub-leases were mentioned upon which no question arises. The tenth clause of the draft was as follows :

"In case either said Charles E. Witbeck or William J. Chittenden shall die before said May 1st, 1891, said leases and this agreement and all the rights, interests and liabilities thereunder, shall belong to and remain to the survivors of them ; and the estate or personal representatives of the one deceased shall take or have no interest or liability thereunder whatsoever."

To this was appended an agreement to be signed by Mrs. Lane and the two sons, agreeing that they would extend the lease to May 1st, 1891, and by Witbeck and Chittenden agreeing that they would take it for the extended period. It seems, however, to have always remained an open question between complainant and Mr. Pond whether the new lease should be for five years or for ten years, and it is not admitted by defendant that Witbeck knew of or assented to the tenth clause above recited.

That no lease was finally executed is due to the fact that by midsummer of 1881 the health of Mr. Witbeck began to fail, so that he became wholly incapacitated for business. July 21st 1881, he was taken to an insane asylum where he remained without recovery until his death, January 22nd, 1882.

This sickness and death created serious embarrassment in the making of improvements, and in the contemplated future arrangements,—Mr. Chittenden hesitating to take a long lease while the future of his partner was so uncertain ; but Mr. Pond and Mr. Chittenden, having entire confidence in each other, early came to an understanding that the latter would take a lease for five or ten years on the terms agreed upon, in case Mr. Witbeck, by reason of his failure to recover, was unable to unite in it, and the improvements were continued and completed on this understanding.

September 6, 1881, defendant, who was the wife of Witbeck, was duly appointed guardian of his estate and person, and, immediately on his decease, she applied for and

received letters of special administration. Witbeck left a will which made his wife sole beneficiary and executor, and this will was probated and letters testamentary issued February 28, 1882.

Complainant continued to manage the Russell House for the benefit of the partnership for a year from the time when the lease had expired, that is to say, until February 1st, 1882. The assets of the partnership at that time consisted of certain real estate, bonds and stocks, a special deposit of over $18,000 in one of the Detroit savings' banks, a few uncollected accounts, and the furniture and supplies of the Russell House. Some of this was probably not strictly partnership assets, but it was owned by the partners jointly and for the purposes of this case it is not important to distinguish it.

Immediately after her appointment as guardian, defendant appears to have raised the question of the rights of Witbeck in the proposed new lease, but complainant denied that he was to have or could have any interest unless he recovered. Mr. H. M. Duffield was then acting as adviser for defendant, and Mr. E. F. Conely for complainant, and efforts in the direction of an adjustment of all matters between them were being made when Witbeck died, and were continued afterward. The difficulties in making an adjustment concerned the proposed new lease, and the losses to the business consequent on the disturbance by the change in the building. There was never any offer on the part of the defendant to unite in the proposed new lease, or to assume in respect to the business any of the obligations and liabilities of a partner, but it was insisted on her behalf that as the arrangement for a lease was made in part for the benefit of Witbeck, and the possession was continuing under that arrangement, the estate was entitled to an interest in the extended term, and that if this was not conceded, then the estate should recover damages for the loss to the business while the improvements, the benefits of which were to be appropriated by complainant, were going on in the house. Defendant also claimed that there was a valuable good-will

belonging to the business which constituted a partnership asset and should be taken into account in any settlement. Neither of these claims was assented to by complainant. Meantime the hotel furniture remained in the Russell House and complainant made use of it in continuation of the business, which, after February 1st, 1882, he claimed to carry on for himself alone.

Brief reference will be made to subsequent negotiations. In March, 1882, complainant caused an offer to be communicated to defendant that he would pay her for the interest of the estate in the partnership and joint property the sum of $50,000. This offer was declined, in part apparently because defendant preferred to take productive securities instead of money, and she in turn made an offer which, like the other, led to no adjustment. On or about April 25, 1882, complainant made to defendant two propositions for a settlement, the first of which was to give her the sum of $51,000, half in property, and half in money, and the second contemplated a division of the partnership property. It was a part of this last proposition that the furniture should be appraised by disinterested appraisers, and that complainant should take it and pay for the interest of the estate therein the sum of $2500 above the appraisal. Mr. Duffield on behalf of defendant replied, rejecting these propositions and making others on her part. To the communication making them was added the following: " Provided that nothing in these propositions is to be construed as in any way a waiver of the right to put a stop at any time to the continued use of the firm property by Mr. Chittenden for his private advantage, or her right to compel him to account for one-half of the profits arising from such past or future use, or in lieu thereof, interest on the value thereof as she may elect." " I am further instructed to inform you that Mrs. Witbeck is advised that there has sufficient time elapsed for Mr. Chittenden to have closed the partnership affairs, and have consummated a settlement thereof, as was and is his duty as surviving partner, and that unless the same is done without fur-

ther delay she will, however reluctantly, be compelled to file a bill in chancery to compel such settlement."

The result of these various propositions was that a portion of the assets of the partnership was passed over to the defendant, and the following receipt given by her:

"Received of William J. Chittenden, as surviving partner of the late firm of Witbeck & Chittenden, the following-described property, as a part of the assets of said firm, coming to the undersigned as executrix of the last will and testament of her husband, Charles S. Witbeck, who was one of said firm.

"This receipt is given simply as an acknowledgment of having received the property herein described, and not as a receipt in full; leaving the remainder of the assets of said firm to be adjusted hereafter, as the rights of said parties may appear, and the acceptance of said articles to in nowise alter or change the legal or equitable relations of the parties as to the settlement of the remaining affairs and assets of the partnership.

"Ten (10) Detroit opera-house bonds of $1000 each; eighty-four (84) shares Detroit Gas Company stock; one (1) share Detroit base-ball stock; certificate of deposit Wayne County Savings Bank, $9120.39; William J. Chittenden's check for $251.44, being my one-half of net income of real estate, as per Mr. Chittenden's account accompanying said check; also secretary's certificate for transfer to me of four (4) shares, stock of Board of Trade Joint-stock Building Company.

*April* 29, 1882.     HARRIET E. WITBECK, Executrix."

This seems to have been practically a settlement of their controversies except in so far as they concerned the hotel furniture and the claims to an interest in the lease, and to damages because of injury to the business by the making of changes in the house. Agreement upon those claims proving impracticable, the complainant filed this bill for a final settlement of the partnership affairs. The bill recites briefly the controversies and claims of the parties, and prays "that your orator may be allowed to purchase said furniture at an appraised price, or if not, that it be divided one-half to your orator and one-half to defendant, or that if a sale is had it be made under the direction of the court, and that both parties be allowed to bid at such sale, and that such sale be

made at such times and in such quantities as will produce the best price without unnecessary injury to your orator; and that the claims of said defendants against your orator and all the remaining business of said partnership be closed up; and for such other and further relief or both as may be agreeable to equity and good conscience."

The defendant answered, and the case went to a hearing on pleadings and proofs. The decree ordered a reference to E. C. Hinsdale as special master, to take and state an account of the partnership dealings: "And it appearing to the court from the pleadings and proofs in this cause that the complainant has retained a large portion of the assets of the firm of Witbeck & Chittenden, wherein the said complainant and the defendant's testator were sole partners, and has used them in the continuance and carrying on the hotel business of the Russell House, without the consent, permission or authority of said defendant and for his own private gain, and has made large profits therefrom," it was ordered that he account for the same; "also that said master take evidence of the value of the services of said Chittenden in managing said hotel business, and from such evidence determine the same; also that he take evidence as to the value of the respective properties of said defendant and complainant which have been used in said hotel business, and from such evidence determine such values; also that he take evidence as to the net profits of said hotel business, from said January 31st, 1882, and that after deducting the value of complainant's services therefrom, he divide the remainder between complainant and defendant in proportion to the value of their respective interests in the property used in said business."

The decree denied defendant's claim to any interest in the good-will of the business of Witbeck & Chittenden; to the agreement for a new lease of the hotel, and her alternative claim to damages for injury to the business pending the repairs and rebuilding. It appointed John H. Kaple receiver of the partnership assets, with power to sell at public or private sale in his discretion on four days' notice to the

parties. Kaple accepted this appointment, and caused an inventory and appraisement to be made of the hotel furniture without removing it from the building.

Both parties appealed from the decree.

The claims of the respective parties, in so far as they concern their substantial rights, have been referred to in the course of the preceding statement of the case, but they will now demand more specific mention. Of these the claim of defendant that the complainant was derelict in duty in not proceeding with promptitude to a settlement of the partnership affairs is hardly made with such particularity of statement and specification as to give us a very clear impression of the precise act or acts, the neglect of which is supposed to constitute the breach of duty complained of. That complainant had a right as surviving partner to settle up the partnership affairs is asserted, and this seems to be disputed by no one. This, in the case of many partnerships, would involve numerous collections and the settlement of complicated dealings with third persons; but in this case there seems to have been almost nothing of that sort to be done, for the partnership owed little, and had but little due to it, and this record does not indicate that, with the exception of the controversy respecting the Russell House lease, any dealings with third persons were the subject of dispute or the source of difficulty, or that the parties to this suit had any such dealings in view when negotiating respecting a settlement of the partnership affairs. The settlement, then, of the partnership affairs was limited almost exclusively to an adjustment of matters between the surviving partner and the estate of the others; and we must find the culpable delay of complainant here if anywhere. From the recital of facts above made it will appear that mutual efforts were made by the parties to bring about a complete adjustment, and while these were progressing without result, we cannot say that one party was in fault rather than the other, for the failure in the negotiations, unless on looking into the propositions and counter-propositions we find good faith clearly manifest on the one side, and a want of it on

the other.   We have looked through this record with care
for the discovery of any such evidence, and are constrained
to say that we do not find it.   The parties have differed
very radically, in some particulars, respecting their rights;
and in some of their negotiations they have become very
warm over their respective contentions.   We do not doubt
that each has believed that an attempt at overreaching was
being made by the other ; but the evidence does not at all
impress us that in this respect either party was justified in
the belief.   The case was such that some loss was to be
inevitable, and each party had very clear and positive views
as to where this loss ought to fall, and shaped the respective
offers for a settlement accordingly.   If the delay under such
circumstances was faulty, it was not the fault of one party
any more than of the other.

But it seems to have been assumed on the part of
defendant that complainant, as surviving partner, under his
authority to settle the affairs of the partnership, might
divide and ought to have divided the assets ; and complaint
was made that he did not proceed to do so irrespective of
defendant's assent to the division, and while in fact she
was expressly withholding her assent.   We are aware of
no rule of law or of equity that could have required of
complainant such a division.   Fair dealing undoubtedly
demanded of  him that he should not exclude defendant
from participation in the partnership assets, so far as she
had occasion to make use of them ; but he had no authority
to set off any definite portion of them to her and retain any
other definite portion to himself, except by some act to
which she became a party consenting.   The division of
property which was at length actually made was precisely
such a division as ought to have been made; namely, a
division by mutual consent.   And though shortly after Mr.
Witbeck's death there was complaint that defendant had not
supplied the widow with money as he should have done,we
find the neglect to have been neither very serious nor long-
continued, and we are not satisfied of any want of good
faith.   We therefore come to an examination of the legal

propositions advanced for the parties respectively, unembarrassed by any such considerations as intentional wrong on the part of either party might bring into the case.

The position of the complainant in this controversy is perhaps sufficiently indicated in the recital of facts.  With this is to be contrasted the claims of the defendant; and as these are very clearly and concisely stated in the brief of one of the counsel, we copy from that.  The claims are—1st. That the estate has an interest in the arrangement or lease under which Chittenden has continued to occupy the premises from the death of Witbeck; that that arrangement was made with the firm and for the firm; and that the estate is entitled to its benefit; 2d. That it has an interest in the good-will of that business connected with the use of the premises and of the furniture; 3d. That it is entitled to a share in the profits that Chittenden has been making in the use of the Russell House and the good-will and the furniture in question; 4th. That at all events the estate is entitled to compensation for the damages suffered in the loss of profits and the expense during such improvements, the complainant having realized all the benefits of such improvements.

These claims will be considered in their order.

I. It is perfectly true that the arrangement for a new lease of the Russell House was made by Mr. Pond and Mr. Clark with the firm and for the benefit of the firm; but when it is said as a deduction from these facts, that the estate is entitled to its benefit, it becomes necessary to inquire how and by what rules of law this follows, and to get over, if we can, certain difficulties that are very palpable and that obtrude themselves upon our notice on the most cursory examination.  The estate is no part of the firm, and never was; and unless it appears that the " arrangement or lease " constituted an asset of the firm at the time it ceased to exist, it would seem that this claim must fall to the ground.

What is the arrangement or lease ?  If it has any existence as a property it must be an interest in land, not resting

in the mere will or caprice of anybody, but constituting a
right and capable of being the subject of legal recognition
and legal defense.   But we look in vain in this record for
evidence of such a property now existing either in the com-
plainant or in any person or persons representing the firm
or either member of it.   What we find evidence of is an
arrangement for a leasing of the firm which was suspended
by reason of the illness of Mr. Witbeck, and which has
never been carried into effect to this day.   A writing was
drawn but never signed, and one very remarkable fact is
that while this writing remains in existence, and is referred
to and claims made in respect to it, not one of the several
parties admits that assent was ever given to its terms by all
the parties who, if it were signed, would be bound by its
provisions.   On the part of the Clark estate one of the trust-
ees and one of the heirs assented, and it is not doubted
that the others would have assented if spoken with, but they
have never done so expressly, and their legal right to refuse
seems to be unquestionable.   Complainant has never
assented to the full term proposed by it, but on the other
hand he expressly reserved the right to take a shorter term
when he found he was likely to lose the support and assist-
ance of his old partner in the business.  And it is strenuously
insisted on behalf of defendant that Mr. Witbeck never knew
of and therefore never assented to the tenth clause of the
drafted lease, which, in the event of the decease of one of the
partners was to exclude his estate from further interest.   If
this last contention is well founded, it seems very certain that
the minds of the parties never met upon the terms of any lease
whatever;   for neither complainant nor the representatives
of the Clark estate ever agreed upon a lease that should not
contain the contested tenth clause, and they also expressly
left the duration of the lease for future arrangement, in
view of a contingency that they did not discuss with Mr.
Witbeck.   If this is disputed, and it be claimed on the part
of defendant that the drafted lease, with the exception of
the tenth clause, expresses the real agreement of the parties,
and that complainant, representing the firm, has been hold-

ing possession pursuant to it, under circumstances entitling the firm to a specific performance against the Clark estate, the difficulties in supporting any such claim on the proofs would be found to be multiform and insuperable. For 1. There is no evidence that the parties or any one of them ever agreed upon the proposed lease with the tenth clause omitted. 2. There is no evidence that possession has been held under the proposed lease with or without that clause; and on the contrary the evidence is conclusive that the occupation is under an oral arrangement between Mr. Pond and complainant to which Mr. Witbeck never was a party, and the estate never was to be a party. 3. Neither Mr. Witbeck nor any one on behalf of his estate ever assumed any responsibilities as lessee under the proposed new lease, nor does any one come forward now and offer to assume any such responsibility. On the contrary the claim is that the estate has "an interest" in the lease, which complainant must recognize though neither the deceased nor any one concerned in his estate was ever either lessor or lessee or assignee, or proposes now to place himself in any one of these positions. How can such an interest exist? Who can describe or define or name it?

That the oral arrangement was made between Mr. Pond and complainant, and that the latter now has possession and is enjoying the advantages and rights of a lessee in the confident expectation of having a written lease and a legal estate when the present litigation is ended, is no doubt due to the fact that the partnership had previously been lessee, and was expected to continue to be lessee when the improvements were made. There is some plausibility, therefore, in the argument that complainant has taken advantage of the previous relation of the firm to the premises to procure a lease for his own exclusive benefit; and the application of such cases as *Featherstonhaugh v. Fenwick* 17 Ves. 298, and *Mitchell v. Reed* 61 N. Y. 123; s. c. 84 N. Y. 556, is insisted upon with considerable force. If these and similar cases are applicable to the facts now under investigation, we should not hesitate to apply them; for the general principle

50 MICH.—27

they declare is not only one of law but of common honesty. But the pivotal fact on which all such cases turn is that there has been underhand and secret dealing by one of the · partners in fraud of the other, whereby he has obtained a special advantage to himself during the continuance of the partnership which fair dealing required that he should have taken for the benefit of the firm ; and equity takes notice of the fraud and declares him trustee for the firm. *Anderson v. Lemon* 8 N. Y. 236.

This pivotal fact is entirely wanting here. There is no evidence whatever that complainant, while Witbeck was alive and capable of being consulted, ever failed to disclose the negotiations to him, or ever contemplated depriving him of joint participation in the lease if the partnership could be or should be continued. The opposite of all this is fully shown: the negotiations were open and frank, and we have every reason for believing that complainant not only contemplated but desired the continuance of the partnership and the renewal of the lease for its benefit. But complainant anticipated the possibility of the partnership unfortunately coming to an end by the death or permanent disability of Mr. Witbeck ; and all his negotiations which were not disclosed, if any such there were, had regard to this contingency. But was there any wrong in this ? If the parties had contemplated a dissolution by the voluntary withdrawal of Mr. Witbeck from the firm, it is plain that there could have been no wrong in such a separate arrangement by complainant as took place here ; and how it can ·be or why it should be different when the contemplated event that was to cause dissolution was death, is certainly not very manifest. What the separate negotiations contemplated was not that the partnership should be deprived of the advantages of a new lease, but that complainant should have a new lease in the event that the partnership, without the fault of either party, should ·come to an end, and for that reason no longer be able to take it.

It is necessary to bear in mind in this case that no new lease was actually made by complainant during the existence

of the partnership, and that all negotiations during that period contemplated Witbeck being made joint lessee if he recovered, and the partnership continued. The estate of Witbeck was allowed without objection an interest in the business up to the time of his death, though for six months he had been incapacitated from rendering assistance as a partner. The controversy concerning the lease relates altogether to the subsequent period, and is in substance this: that complainant, by reason of the antecedent relation and negotiations, was under equitable obligation to take a new lease for the joint benefit of the estate and himself. If this were so, it would place a surviving partner under such circumstances in a position and subject him to liabilities which could never have been contemplated when the partnership was formed. Partnerships are entered into for the mutual advantage of all the members, and it is understood that all are to have the benefit of the advice, assistance and responsibility of their associates, and while sharing the profits are to share also the losses if any unfortunately shall occur. It is not understood or expected that a single contract will be made the responsibility of which will rest upon one or more of the partners to the exemption of the others, or that one shall put his property and responsibility at stake upon the results of the business, and that the others shall share in the profits while escaping responsibility for the losses. But this is what in effect is demanded of this complainant. It is insisted that he shall take a lease in which he will be sole lessee and solely responsible for all the contingencies of depreciation and loss, and that at the same time he shall account to another, who incurs no risk and no responsibility, for some share in the anticipated but altogether contingent profits. If the demand were that under the circumstances he should admit some one representing the estate of the deceased partner, to unite with him in the lease and join as a partner in the continuance of the business, it would seem more reasonable; but even then, for very obvious reasons, no rule of law could require assent to it. Partnerships are founded in and must repose upon mutual confidence and

trust; the members are general agents for each other in the business, and a single act of dishonesty or even of imprudence on the part of one member may bankrupt them all. The law will therefore never force a partner upon an unwilling person; and where the association is terminated by the death of one, his representative cannot demand of right admission to the business as a partner for the very conclusive reason that the unlimited trust and confidence which the relation demands may not exist in respect to him. If, therefore, in this case defendant had offered to assume the position of her deceased husband in the proposed new lease and become a partner in the continuance of the business, complainant would have been under no obligation, honorary or otherwise, to accept the offer, and might have declined without being justly subject to censure. But no such offer has ever been made by defendant, and we have no reason to suppose she desires it. In fact, looking to her interest exclusively, the contested tenth clause of the drafted lease, which was to make death terminate the interest of a partner in the lease, and relieve his estate of all responsibility in respect thereto, seems to be a reasonable and prudent provision. Without some such clause the estate would be bound for the whole term for the acts of a party over whom its representatives could have no control, and in respect to a contract that might be rendered not only unprofitable but highly onerous by accidental circumstances, or by such diversions of business as no one could prevent or control.

But without enlarging further on this branch of the case we give full assent to the conclusion of the Superior Court that defendant has no interest in the present occupancy of the Russell House, or in the proposed new lease.

II. The second claim is that defendant has an interest in the good-will of the business connected with the use of the Russell House and the furniture. By good-will we suppose must be intended the favor which the management of the Russell House has won from the public, and the probability that the old customers will continue to give it their patronage for the future. *Cruttwell v. Lye* 17 Ves. 335; *Snow-*

*den v. Noah* Hopk. Ch. 347; *Wedderburn v. Wedderburn* 22 Beav. 104. This is no doubt of great value to the house, and must give it great advantages over any new establishment that might be set up as a competitor. But when the lease of Witbeck & Chittenden expired this good-will did not belong to them but to their lessors; it attached itself not to the partnership but to the property; and the lessors were entirely at liberty to take it into account as a part of the value of their property when fixing upon the rent to be demanded by them for the future. When a lease should be actually granted, the good-will for the term would belong to the lessees; but until they had obtained a lease or established their right to one, any controversy in respect to good-will as between themselves would be a controversy in respect to something which belonged altogether to others. The claim of defendant, then, to an interest in the good-will is inseparable from the claim to an interest in the lease, and when the one falls the other goes with it. In this particular also, the conclusion of the Superior Court was correct.

III. The third claim is that defendant, as the representative of the Witbeck estate, is entitled to a share in the profits that complainant has been making in the use of the Russell House and the good-will and the furniture. This claim was sustained by the decree at the same time that the right to participate in the use and the good-will was rejected. The right, then, to share in the profits was left to rest solely on the interest of the estate in the furniture. Surely this is too narrow a basis to support the right. If the furniture were of greater importance to the business than anything else, and complainant had wrongfully made use of defendant's share of it and reaped profits therefrom, he might justly be called upon to share the profits with defendant. But in this case the house was of more importance to the business than the furniture; and so also, probably, were the services of the complainant. The furniture might at any time have been removed and its place supplied without serious interruption to the business.

But the right of defendant to demand a share in the profits because of this use of the furniture, is without substantial equity unless the use has been wrongful; and it is necessary to see whether that is the case. In doing this we must look at the position of the parties when the use began, and we are entitled also to know what they respectively have said and done and what claims they have advanced in respect to it.

We find, then, that on February 1, 1882, when the estate ceased to have any interest in the business, the furniture was in use in the house, and negotiations were going on between the parties, looking to an adjustment of the controversies which unhappily had arisen. In strictness complainant had no right to make use of the furniture for a single day in his private business, and it was perhaps his duty to remove it from the house immediately and to proceed to inventory and divide or sell it. But did defendant desire this to be done? There is abundance of evidence in this record that she did not. On her behalf protests were interposed to the continued use of it in complainant's exclusive interest, but this was a part of the general purpose to insist upon participation in the profits of the business. It is manifest that complainant could not cease to use the furniture without removing it unless at the same time he ceased to carry on the hotel; and a demand that he should do so and still leave the furniture where it was, was equivalent to a demand that he should suspend business. But this was the demand that was made; and inasmuch as another case is to be decided with this, in the record of which the fact appears, we may properly notice here that when, after the decree was entered, the complainant notified the defendant that he should remove the furniture from the hotel, he was immediately restrained by injunction from doing so. It is quite correct, therefore, to say that if complainant had yielded to the demands made upon him—that he should cease to use the furniture but not remove it—the house must have been closed. His use of it under such circumstances bears upon its face no evidence of such intentional

wrong as can justify his being charged in equity as for profits wrongfully earned. His position was peculiar and highly embarrassing; and while he was endeavoring to save his business, if he was disposed at the same time to give to his late partner's estate its just interest in the assets, he should not be charged with penalties or damages because under the circumstances, he could not immediately comply with all the technical requirements of the law; much less because he did not comply with demands when compliance would destroy his interests, and benefit no one.

What complainant should account for is the deterioration or destruction of the furniture while it has been used by him, and for interest on the amount. Nothing further could justly be required. With the legal questions settled, it would seem that the parties ought to be able to adjust all controversies concerning the furniture by voluntary arrangement; and twenty days will be allowed for the endeavor. If this fails, the receiver may proceed to sell, in the mass or in parcels, as his judgment shall dictate, with liberty to both parties to compete as purchasers.

IV. The fourth claim of defendant is that the estate is entitled to compensation in the nature of damages because of the loss of profits and the increased expense consequent upon the improvements in the building; the circumstances being such that the complainant will take the benefit of the improvements. This claim is obviously to be discussed on an assumption that the oral understanding between Mr. Pond and the complainant is to be carried into effect; for otherwise it could have no basis whatever. We shall therefore make that assumption for the purpose of determining whether the claim can then have any foundation. It is to be observed at the outset that no charge of wrong-doing in respect to the improvements is made against the complainant; but it is abundantly shown, and not disputed, that whatever was done was with Mr. Witbeck's full concurrence. The truth, apparently, is this: That the time had arrived when the good of the hotel as a piece of property and a place of business required that the building should be

enlarged and improved. All parties agreed in this; but the improvements could not be made without subjecting the lessees to temporary inconvenience, and to some diminution of profits. But the lessees contemplated a renewal of their lease; .and the lessors stood ready to agree that they should have it if they would permit the improvements to be made. In view of all the circumstances, and on a consideration of their own probable interest, the lessees gave their consent.

In giving this consent, no doubt each of the lessees expected—or at least hoped—that he would live to become a party to the anticipated new lease, and that the partnership would continue its business in the same place for another considerable period. Each submitted to the consequent loss in that hope, and sacrificed to future expectations an immediate advantage. Death, as to one of the parties, has disappointed the expectations after the price for the expected benefits has been paid. And it remains to be seen whether the other can justly be called upon to make good the loss to the estate of his late associate.

It is to be observed, in the first place, that the losses are not all on one side. Complainant has lost his associate in business, and all the benefit of his advice, assistance, estate and credit in the business. We have no right to assume that this is an unimportant loss; the negotiations of complainant with Mr. Pond show very clearly that he considered it a great embarrassment in respect to his future business, and hesitated to take alone the ten-years' term the partnership had asked for. But passing this consideration, it is to be observed further that the claim now under discussion is based upon a supposed moral obligation on the part of complainant to account for an additional benefit which he obtains from the estate consequent on the death of his partner. But that he will receive any such increased benefit is altogether a matter of assumption. And the same error is made in respect to this part of the case which has been pointed out in considering the claim to compensation for the good-will.

It is no doubt true that the occupation of the Russell House

is worth more to the lessee than it was before the improvements were made. But it is also true that the lessee pays more for the use because of the improvements; and we cannot assume that he pays any less than the market value. The owners named for themselves the rent that they would exact; and as rents are determined by selfish interests and not by favor, we are to suppose that they exacted what the use was worth. If they did so, what complainant would get by the new lease would be, not something having a present market value, but a place for business, for which he would pay market value, but which he would perhaps make highly valuable to himself by his skill, prudence, application, courtesy and foresight in the future. But these advantages he might suppose would be diminished rather than increased by the fact that he must manage the property and business without the aid of the partner whose fitness for it he had had such long and favorable opportunity for observing. No mistake could be greater than to infer that because a proposed lease would have a prospective value for two persons who contemplated making use of it for their business, it would therefore have twice the value, or even any additional value, for one of them. And certainly to charge one who is about to take a lease, and who presumptively is to pay to his landlord for it all it is worth, with the payment of an additional sum upon the assumption that his business skill and industry in the future would give it additional value, would be gross injustice. Surely if by his business capacity and energy he gives value to the term, the consequent profits will justly belong to him. There is no foundation in equity, therefore, for this claim. The case is of the same nature with thousands which are happening constantly, where death disappoints promising expectations. Survivors may or may not be bettered or prejudiced in their interests in consequence; but the happening of gain, no more than the happening of loss, can give rise to a cause of action under such circumstances.

The result of our review of the case is that the decree of the Superior Court must be modified as indicated in respect

to the claim to a share in the profits, and in all other particulars must be affirmed with costs to complainant.

The other Justices concurred.