CHARLES TYGART, Respondent, *v.* WARREN R. WILSON and JAMES H. SHEFFER, Appellants.

*Partnership — application by one partner for a renewal to himself alone of a lease to the firm.*

The rule that one partner shall not, during the term of the copartnership, secretly secure to himself an extension of the lease of premises occupied by the firm, is applicable to a case where negotiations to that end are carried on by him during the term, although they are not consummated by the execution of a lease until after the dissolution of the copartnership; but where one member of a firm has given notice that, at a certain time in the future, he will withdraw from the copartnership, and that he will not be responsible for the rent of the premises occupied by the firm after that time, he must be considered to have waived any interest in the so-called tenant's right of renewal, and the other partners are not forbidden by such rule from negotiating for a renewal of the lease of such premises to themselves for their own benefit, especially where knowledge of such negotiations is not withheld from the retiring partner, who has also applied to the landlord to ascertain upon what terms he could obtain a new lease of the premises.

APPEAL by the defendants, Warren R. Wilson and another, from a final judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Albany on the 11th day of October, 1898, upon the report of a referee, except from so much of said judgment as adjudges that the copartnership existing between the plaintiff and the defendants from the 1st day of December, 1892, to the 1st day of December, 1897, under the firm name and style of Wilson, Sheffer & Co., was dissolved on the 1st day of December, 1897, and also excepting that portion of said judgment adjudging that the relative interests of the plaintiff and the defendants in and to the assets of the firm of Wilson, Sheffer & Co. are in the following ratio : That of Charles Tygart, the plaintiff, is 43.370 per cent, and the combined shares of the defendants, Warren R. Wilson and James H. Sheffer, is 56.630 per cent, and also excepting that portion of the judgment wherein it is adjudged that the receivership herein be continued.

On the 1st day of December, 1892, the plaintiff entered into articles of copartnership with defendants under the firm name of Wilson, Sheffer & Co., in the grain and milling business in the city of Albany. By the terms of that agreement the copartnership was to commence on the 1st day of December, 1892, and to continue until terminated by mutual consent, or either might terminate the copartnership at the end of any fiscal year upon giving at least three months' written notice of his intention so to do.

Such copartnership, on the 7th day of December, 1892, rented of one George W. Coonley certain buildings with engine and machinery suitable for milling purposes, situated in the city of Albany, for a term of four years and three months from the 1st day of February, 1893.

Prior to or about the 1st day of April, 1897, the plaintiff orally notified the defendants that he was going to withdraw from the firm on the first day of May ; but subsequently, on or about the first day of May gave them a written notice that he would terminate such copartnership on the 1st day of December, 1897.

The plaintiff thereafter, and by a complaint verified December 3, 1897, commenced this action for a dissolution of the copartnership and for an accounting, and applied for the appointment of a receiver pending the action. A temporary receiver was appointed,

the action was referred to a referee, and from the judgment entered upon the report of the referee this appeal is taken.

The referee reported that the defendants owed to the firm of Wilson, Sheffer & Co. the sum of $453.64, and that such sum should be paid to the receiver. Such sum is made up of several items which are found in separate findings of fact, some of which will be more particularly adverted to in the opinion herein. The referee also found as a conclusion of law "that the lease of the mill property representing the good-will of the business obtained by the defendants in their own name, should be taken and sold by the receiver for the benefit of the firm of Wilson, Sheffer & Company." He also found " that the plaintiff's costs of this suit should be paid by the firm of Wilson, Sheffer & Company."

*Frederick E. Wadhams,* for the appellants.

*Fletcher W. Battershall* and *J. Newton Fiero,* for the respondent.

HERRICK, J. :

The relation of partners to each other is that of trustees and agents, and they are required to act with the utmost good faith in their dealings with each other ; neither one can be permitted to surreptitiously take advantage of the other, and every advantage that he thus obtains in affairs pertaining to business inures to the benefit of all the partners ; accordingly it has been held that one member of a copartnership cannot, during its existence, without the knowledge of his copartners, take a renewal of a lease for his own benefit. (*Mitchell* v. *Reed,* 61 N. Y. 123 ; *Struthers* v. *Pearce,* 51 id. 357.) This rule is so well established that there is no occasion for the multiplication of authorities to verify it.

" Those who are in possession of lands under a lease have an interest therein beyond the subsisting term usually called the tenant's right of renewal. Between the landlord and tenant this interest cannot strictly be denominated a right or estate, but is merely a hope or expectation, there being, in the absence of contract, no way, legal or equitable, of compelling a renewal. But, as between third persons, the law recognizes this interest as a valuable property right, and the renewal as a reasonable expectancy of the tenants in possession." (*Robinson* v. *Jewett,* 116 N. Y. 40, 51, and cases cited.)

The superior opportunity or chance that a tenant has to renew his lease, that intangible thing known as a "tenant's right," is a thing of value, and if that tenant is a copartnership it is accounted one of the assets of the copartnership, which no member has a right clandestinely to appropriate to himself.

None of the cases cited, however, or any which I have been able to discover, have gone the length of holding that, under no circumstances, can a member or members of a copartnership take a lease of the premises occupied by their firm for his or their own benefit. It would be unreasonable to hold that, after the dissolution of a copartnership, or the fixing of a time when it is to be dissolved, neither member of such copartnership should be at liberty to lease the premises theretofore occupied by them for his own benefit, but could only take it for the joint benefit of those who were no longer to continue in the business.

The sum and substance of the principle is that a partner shall not secretly or clandestinely take advantage of his position to better himself at the expense of his associates. That he shall not, as some of the cases express it, "go behind the back" of his copartner to obtain that, solely for himself, to which all of his associates are equally entitled. There must, however, be circumstances under which a member of a firm dissolved, or about to be dissolved, can make arrangements for continuing the business where it had been previously carried on, and for that purpose acquire a lease of such property. This is recognized, indirectly it is true, but still recognized, in the opinion of the court in the case of *Struthers* v. *Pearce* (*supra*), the court saying : "The material fact is found by the judge that the lease in question was taken by the defendants during the existence and continuance of the partnership for their individual benefit, and to the exclusion of all interest therein by the plaintiff, and that this was done secretly and without notice to him. It also appears by his findings that the term of the copartnership was not for a fixed and definite period, but was to continue *during the pleasure* of the parties, and it is not found that any agreement had been made or that any act had been done or notice given by either party by which the time for its dissolution had been ascertained, fixed or determined, nor that there had been any expression or indication of the will or pleasure of either party by which the relation between

them had been discontinued when the lease was obtained. We must, therefore, assume as a fact that the partnership was in existence and that no definite time had been fixed for its dissolution at that time, or, in other words, that it was still ' a *continuing* partnership of *undetermined* duration,' and on that assumption the judge was clearly right in declaring as his conclusion of law that the lease was partnership property. The rule or principle is well settled in such a case, as stated in the clear, terse and expressive language of the counsel of the appellants when he says : ' It is true that where no *definite time* is fixed for dissolution, though the firm may be dissolved at any time on notice, yet until such notice is given the partnership is deemed to *continue indefinitely*, and the term of a lease so renewed is, therefore, deemed to *commence within the term of the partnership* and becomes a partnership asset.' "    (P. 361.)

In the case before us the partnership, like that in *Struthers* v. *Pearce*, was not fixed and definite, but it was to continue during the pleasure of the parties ; unlike that case, however, notice had been given by the plaintiff of the termination of such partnership at a fixed time, and at the time of the negotiations the partnership existing between the parties was not " a continuing partnership of undetermined duration."

In this case the lease would expire on the first of May. Prior to, or about, the first of April the plaintiff notified the landlord that the copartnership existing between him and the defendants would terminate on May first ; that he would withdraw from the firm on that date, and that he would not be responsible for the rent of the premises after that time. He also, before the first of May, notified the defendants that he would retire from the copartnership May first ; ascertaining or recalling the fact, however, that he could only do so under the articles of copartnership, at the end of the fiscal year and by giving three months' written notice, he on the first day of May gave them written notice that he would withdraw from the copartnership on the thirtieth day of November or the first of December, and he again, on November nineteenth, notified the landlord that the copartnership contract would expire November thirtieth, that he would then retire from the firm and he would not be responsible for the rent after that time.

After giving these notices I do not see how it can be claimed that

he could expect any renewal of the lease for his benefit. It seems to me that they constituted an abandonment of the so-called "tenant's right of renewal."

In this case the lease was not executed until December twenty-seventh, after this action had been commenced and after the motion or the appointment of a receiver had been argued.

It is claimed, however, that while the lease was not executed until after the dissolution of the copartnership, yet the agreement for the lease was made during the existence of the copartnership and that, therefore, it must be held as taken for the benefit of all the former copartners.

I think the evidence justifies the holding that the execution of the lease on the twenty-seventh of December was simply the culmination of negotiations had, and the consummation of an agreement practically made before December first, but it does not necessarily follow from that that the lease should be held as taken for the benefit of all the former copartners.

Of course negotiating for a lease and agreeing upon its terms during the existence of a copartnership, although it is not to be actually executed until after the dissolution of the copartnership, is open to the same objection as the actual procurement of the lease during the continuance of the copartnership. The question in each is whether there has been any breach of the duty that one copartner owes to the others. Whether an undue advantage has been taken of the copartnership relations. The circumstances under which the negotiations for the lease were conducted must determine in each case whether there has been any breach of copartnership duty, and whether the acts of the copartner negotiating for his own benefit must, because of such breach, inure to the benefit of all.

No hard and fast rule can be adopted to govern every case, no matter what the circumstances are.

In this case it was after the notices to the landlord and to the defendants that the copartnership would terminate at a specified time, and that the plaintiff would not be responsible for the rent beyond that time, was given, that negotiations began between the defendants and the landlord for the renewal of the lease; there appears to have been nothing secret or clandestine about it; it was not a case where one partner obtained a renewal of the lease behind

the back of the others before the dissolution of the copartnership, or before it had been agreed to be dissolved, whereby the other partner was forced out of the business, but after the plaintiff had announced his intention to retire from the firm, and after he had announced that after the time fixed by him he would no longer be responsible for any portion of the rent of such premises; by such acts and declarations upon his part, it seems to me, as before stated, that he waived any part or interest in what has been referred to as the " tenant's right of renewal."

The knowledge that the defendants were negotiating for a renewal of the lease was not withheld from him, but was known to him, for he applied to the landlord to ascertain upon what terms he could obtain a lease of said premises, in the event of the defendants not taking them. The plaintiff raised no objection to the defendants leasing such premises, except that they should not do it during the continuance of the copartnership.

The case is not like that of *Clegg* v. *Edmondson* (8 DeG., M. & G. 787), cited in *Mitchell* v. *Reed* (61 N. Y. 123, 136), where two partners in a copartnership about to be dissolved objected to the other three taking a renewal of the lease, claiming that such renewal should be for the benefit of all.

Here there was no claim upon the part of the plaintiff that he should have any part or benefit in the new lease ; simply an application for it for himself in the event of the defendants not taking it.

Under the circumstances in this case it does not seem to me that there has been any breach of trust on the part of the defendants, or violation of the fiduciary relation existing between themselves and the plaintiff, or that they did anything more than is permissible to business men when they ascertained that the plaintiff proposed withdrawing from the copartnership. It can hardly be expected that, when a copartnership has occupied real estate under a lease, all the members thereof shall be barred from renting such premises for a continuation of such business after the termination of the copartnership, except upon the expressed consent of the other copartner or copartners; that, probably, in a large majority of instances, would mean that when real estate was once leased by a copartnership, it could not be used after the dissolution of such copartnership for carrying on business by any of the members of the old copartnership.

It also seems to me to be going too far to hold that, after copartners have agreed upon a dissolution of the firm at a fixed time, neither of them shall be permitted to enter into negotiations for the carrying on of the same kind of business until after the actual dissolution of such copartnership and the winding up and settlement of its affairs. Landlords cannot be expected to hold their property in such an indefinite way.

In this case I can find nothing in the evidence to show that the defendants acted in any underhand way in securing the renewal of the lease in question here, or that they in any wise violated any duty that they owed to the plaintiff in the premises; I conclude, therefore, that the referee was in error in holding that the renewal of the lease must inure to the benefit of the plaintiff, and be treated as a copartnership asset to be taken and sold by the receiver.

The referee found " that the defendants owe to the firm of Wilson, Sheffer & Company the sum of $200, which should be paid to the receiver." This charge of $200 against the defendants arises out of the following circumstances, as appears from the testimony of an accountant who examined the books and accounts of the firm :

In December, 1896, the firm purchased 5,275.22 bushels of rye, at 44 cents per bushel; this, according to the expert's testimony, amounted to $2,321.22, less freight at 11 cents per hundred, amounting to $324.97. There appears on the cash book in settlement of that account that there was paid one check for $1,975, another check for $21.25, and a check in settlement of the freight for $308.22.

The bill for this rye was entered upon the books, in what is called the rye account, at $2,521.33, thus increasing that account by $200 ; it is claimed that the figure 3 has been changed to the figure 5 by by one of the defendants.

The expert who examined the books, and who was a witness for the plaintiff upon the trial, and who apparently first discovered this discrepancy, in answer to the question as to what the effect of this change was, answered, " It decreases the profit and loss account; it increases the rye account. The rye account is balanced up at the end of the year. It increases the debit of the rye $200, making

the profit in rye $200 less. In other words, it charges the firm with $200 more than it ought to charge."

During another portion of his testimony, in speaking of the profit and loss account, he was asked the following question : " Q. Does it make any difference in the amount that each partner will receive the settlement of their affairs, when there is nothing to divide, except the cash received from the bills and accounts receivable, and from the inventory of the stock on hand ? A. No, sir ; not when the profit and loss account is correctly made. All the profit and loss account is good for is to show whether they make or lose money. You will not get any more money than they have, certainly, but it will show what each partner is entitled to of the assets of the concern. * * * Q. Mr. Ellis, how, if at all, does that fact which you have stated with reference to the rye affect the interests of one individual partner as against the others upon the settlement? A. This one transaction will increase the assets of the concern in the profit and loss sheet. The case of that rye something in the neighborhood of $250, that will increase the amount that goes in as a credit in the profit and loss sheet to be divided among three creditors. Q. It is nothing more than a matter of bookkeeping ? A. They all share alike. Q. Then that is purely a matter of bookkeeping ? A. That is all."

Again, he says : " The footings in the rye accounts do not appear anywhere else except on this book. Q. They do not enter into any calculation of division of profits ? A. That has not been made up yet. No one has been harmed as yet by that change. In any event, it would only increase on the books or decrease the profits or loss sustained by this firm. That is all. It would not deprive anybody of a dollar."

How, under this evidence, the defendants can be properly charged with $200 I do not see ; there is no pretense that they have received any part of it, or that they have improperly paid it out to any one, or that the real assets of the firm have been increased or diminished by it. I can understand that, if they were endeavoring to sell out to some one their interest in the concern, such an entry changing the apparent assets of the concern might enable them to secure a larger price for their interest, but this accounting between the partners is being taken upon the actual, not apparent, assets, and

each partner is to be charged with what he has actually received or improperly disposed of, and is to receive his portion of what the partnership actually has; and where there is no claim that they have received this sum or improperly disposed of it, and where the evidence is undisputed that nobody has been harmed by the entry, I can see no reason for charging the defendants with an amount of money which they have not received, lost or paid out, and which the copartnership has neither received, paid out or lost.

The same remarks will apply to the finding of the referee that the defendants owe the firm of Wilson, Sheffer & Co. the sum of seventy dollars.

There are also several findings by the referee of indebtedness by the defendants to the firm caused by duplicate payments, for instance one of fourteen dollars and fifty-five cents. It is stated by the expert witness who examined the books that he found a cash payment of fourteen dollars and fifty-five cents, made November 22, 1897. On the 23d day of November, 1897, a check was given in settlement of an account which included this same item of fourteen dollars and fifty-five cents, which check it is claimed is signed by the defendant Wilson. There are several other findings of indebtedness by the defendants to the plaintiff arising out of alleged duplicate payments where the checks for the second payments were signed by the defendant Wilson. There is no claim, as I understand it, that either of the defendants appropriated these second payments to themselves, or either of them, but they are apparently held liable for negligently or improperly paying bills which had already been paid, but why both defendants should be charged for the negligence or improper act of one I do not understand.

It will be observed that the defendants have not only been held responsible for a second payment of accounts already settled, where the checks had been drawn by one or other of them, but they have also been held responsible for the sum of seventeen dollars and thirty-six cents where the check for the second payment was drawn by the plaintiff. The cash payment of seventeen dollars and thirty-six cents appears to have been made January 22, 1897, and the check which included this seventeen dollars and thirty-six cents, with which the referee has charged the defendant, was drawn January 29, 1897, and was drawn by the plaintiff. From an examination of the books

the expert states that the bill in question was paid twice, and that the seventeen dollars and thirty-six cents included in the check calls for the same thing that had been previously paid for in cash.

Why both defendants should be made to pay for a second payment improperly made by one, or to pay for a second payment improperly made by the plaintiff, is something that has not been explained in the printed brief or by the oral argument and does not appear from the testimony in the case.

If bills have been paid twice, the parties receiving such payments are liable to the copartnership for the overpayment, and such claims constitute a part of the assets of the firm, to be collected by the receiver.

Unless in cases of gross negligence, I do not understand that copartners are personally liable to the copartnership for overpayments. The losses incurred by error and mistakes of the several copartners in the course of business are part of the hazards of any business, and must be borne by the copartnership, and not by the individual members through whom they occurred, unless they happen through gross negligence.

Here there is no claim of bad faith in making these second payments, nor that there was gross negligence, but for aught that appears they were purely accidental.

I refrain from an examination of the other findings of fact and express no opinion thereon, because, with the view that I take of the case, a new trial will be necessary, in which all questions of fact will be passed upon. The fact, therefore, that other findings have not been here adverted to is not to be taken as an intimation of approval or disapproval of them.

The judgment should be reversed, referee discharged, and a new trial granted, costs to abide the event.

All concurred.

Judgment reversed, referee discharged, and a new trial ordered, costs to abide the event.