## M. J. EBBERTS ET AL. V. MARRS McLEAN ET AL.

No. 6764.   Decided December 2, 1936.
Rehearing overruled January 27, 1937.
(98 S. W., 2d Series, 352.)

*James R. Dougherty, L. J. Freeman,* both of Beeville, *Dodson & Ezell,* of San Antonio, and *Breckenstein & Carrington,* of Beaumont, for plaintiffs in error.

That defendant McLean acquired certain oil leases in his own name, and acquired various sums of money from plaintiffs and became sole manager of the enterprise to drill oil wells, and by so doing became responsible to plaintiffs to exercise the utmost good faith in dealing with said leases and the property of the venture held by him in trust for his associates. And by acquiring subsequent leases from the same parties while the lease belonging to the adventure was in full force, which lease was adverse to the interests of the plaintiffs and gave to McLean the option of forfeiting the first lease was a breach of his duty as fiduciary to plaintiffs and therefore he held this lease subject to the same trusts for plaintiffs to the extent of their interest in the venture. Roberts v. McKinney, 187 S. W., 976; Thompson v. Duncan (Com. App.), 44 S. W. (2d) 904; Thuss on Texas Oil and Gas, 203; 25 Texas Jur., 159; Carver v. Moore, 275 S. W.; 90; Luginbyhl v. Thompson (writ refused), 11 S. W. (2d) 380.

*W. D. Gordon* and *E. E. Easterling, W. E. Orgain, Orgain, Carroll & Bell* and *Beeman Strong,* all of Beaumont, for defendants in error.

There was no error in the lower court sustaining the general demurrer to plaintiffs' petition; neither was it error to hold that plaintiffs' case was barred by the four year statute of limitation. Whitman v. Bartlett, 156 Ala., 546, 46 So., 972; Robichaux v. Bordages, 48 S. W. (2d) 698; 33 C. J., 847; Hightower v. Hester, 15 S. W., 415; Kennedy v. Baker, 59 Texas, 150; Tennen v. Mebane, 10 Texas, 252.

MR. JUDGE GERMAN delivered the opinion of the Commission of Appeals, Section A.

A very accurate and elaborate statement of the material facts in this case will be found in the opinion of the Court of Civil Appeals in 68 S. W. (2d) 1077. As we are of the opinion, after a careful consideration of the case, that the conclusion reached by the Court of Civil Appeals is correct, we

do not think it necessary to make an extended statement of the facts here, or to discuss all of the questions considered by the Court of Civil Appeals.

It appears that plaintiffs in error, M. J. Ebberts and others, who were plaintiffs in the trial court, and will be so designated herein, are seeking to recover of Marrs McLean, the principal defendant, upon the theory of a trust relationship between him and themselves, by virtue of which they are entitled to participate in profits arising from operations under an oil and gas lease dated July 27, 1918. It follows that if they have failed to impress upon that lease a trust in their favor they are not entitled to recover, and the trial court was correct in sustaining a general demurrer to their petition.

On January 4, 1918, McLean entered into the following agreement with various persons, designated subscribers, including plaintiffs:

"Well No. 3. Marrs McLean is the owner of oil and mineral leases on the following described tracts of land at High Island, aggregating a total of (642) Six Hundred and forty-two acres, to-wit: (Here follows description of leased premises.)

"Marrs McLean proposes to organize a company with a capital stock of Fifteen Thousand Dollars divided into shares of Fifty Dollars each. *The money thus raised to be used is development work on said leases.* McLean agrees to assign the above described leases to the proposed company for one-fifth interest in the proposed corporation's stock or any increase thereof, the said interest being full compensation to McLean for the leases, promotion of the corporation and looking after the development work. McLean agrees that in event he starts development work prior to the incorporation of the said company he will conduct the work in his own name without any liability to the subscribers hereto.

"As soon as all stock in the proposed corporation is subscribed for, a meeting will be called for all subscribers hereto for the purpose of perfecting the organization of the company. All subscriptions are to be paid to J. T. Shelby, who will act as treasurer prior to incorporation. One-half of subscription to be paid at time of signing this subscription list and the balance within thirty days thereafter.

"We, the undersigned, subscribe for the amount set opposite our names *with the understanding that the amount is to be the full amount of our liability.*" (Emphasis ours)

The capital provided by the subscriptions under this agreement was all used by McLean "in development work" on the

lease in question, and resulted in said Well No. 3 being a dry hole. Under the leases in question it was necessary for the lessee to begin actual operations in the drilling of another well within ninety days from abandonment of Well No. 3, or the leases would automatically terminate.

After the failure to discover oil by the well in question McLean obtained what is designated a "top lease" of date July 27, 1918, which included lands covered by the leases of January 4, 1918, and also additional lands. This lease of July 27, 1918, contained among other things the following provisions:

"It is further agreed that this lease is not to become of full force and effect until the lease made by the parties hereto on January 4th, 1918, and recorded in the Deed Records of Galveston County in Book 308, pages 574 to 578 inclusive is forfeited.

"If the lessee succeeds in developing oil in paying quantities or continues development work on the said lease of January 4th, 1918, this present lease is not to be of any effect or force whatever, as is the understanding of the parties hereto that this lease is to be a substitution of said lease executed on January 4th, 1918, at the election of the lessee and the execution of this lease prior to the forfeiture of the said lease of January 4th, 1918, is done solely for the purpose of saving time in the event the lessee should elect to abandon said lease of January 4th, 1918, and do development work on the westward side of the Hill at High Island on the land embraced in the present lease."

On November 17, 1918, McLean made a written report to the shareholders in Well No. 3. After stating that there was certain casing and other machinery on hand as salvage from the operations on Well No. 3, of the probable value of $2500.00 or $3000.00, the report contained the following statement:

"I am preparing to drill a fourth well at High Island on about 400 acres of leases, and have made proposition to most of the shareholders, which was acceptable to them, to use this pipe for my next well, and allow the stockholders in No. 3 well a stock interest in the No. 4 well of $6,000.00, which makes salvage amount to 33 1/3% on capital stock of $18,000.00. I am allowing shareholders in No. 3 well approximately the full value that it would cost the shareholders in No. 4 well to duplicate this material.

"The capitalization against the next well will be $17,000.00.

"I appreciate the support you have given me in this work. I have done my best to give every one as good a run as possible

for their money, and will continue to do so. So far I have no oil to show, but I believe I eventually will, as possible locations to test out High Island are now so limited that a bad guesser now stands a chance of picking right."

None of the plaintiffs made an effort to contribute anything to the drilling of the fourth well. In this report of November 17, 1918, they were specifically advised that "the capitalization against the next well will be $17,000.00," but they did not offer to contribute any part of this capitalization, and did not do so, except that McLean did use the salvaged casing and machinery in the drilling of this well. According to plaintiffs' petition, the arrangement of January 4, 1918, constituted the third enterprise in which McLean had acted for his friends (principally the same parties who were subscribers to the third venture), under an agreement which in effect provided that the money contributed by the subscribers would be used for development work, and in the event oil was discovered the leases would be assigned to a corporation, of which the subscribers would be shareholders in proportion to their contributions. We therefore construe McLean's statement in the report of November 17, 1918, as an invitation to the shareholders to contribute to the capitalization of the fourth well. If they desired to do so. They did not avail themselves of this opportunity. While McLean apparently began the drilling of the fourth well, he abandoned it without discovering oil. His action in this respect was due to a lack of funds, according to a subsequent letter. On December 17, 1918, McLean assigned all leases to the Sun Oil Company. On March 31, 1919, at the request of the Sun Oil Company, McLean obtained an additional lease from parties who had executed the lease of July 27, 1918, in which it was recited that the leases of January 4, 1918, had been forfeited. This lease of March 31, 1919, was placed of record. On March 3, 1919, McLean addressed a letter to the shareholders in Well No. 3, including the plaintiffs herein, in which he enclosed check for the amount received by him for salvage on casing and machinery which had been used in Well No. 3, and for which the shareholders had been given a credit of $6000.00 in the capitalization against Well No. 4. In this letter McLean, among other things, stated:

"It was my intention to drill a fourth well and carry the shareholders of No. 3 in it, in lieu of a cash salvage, but was unable to go ahead on account of not having in sight sufficient support, so I made a trade with the Sun Company in which they take over my leases. In my assignment to them I will

reserve two ten acre tracts—one north and one south of the well for the benefit of the shareholders in No. 3 in proportion to their interest. The two ten acre tracts being in the Fitz-simmons Survey and being the east half of Blocks 25 and 32 and the south half of Blocks 10 and 11. The leases being held under the drilling of No. 3 well have been forfeited, except a 15 acre tract off of west end of Smith lease on S. W. side of hill and ten acres of the League lease on South side of hill. I am keeping rentals paid on these leases."

After the assignment by McLean to the Sun Oil Company that company spent large sums of money in operations to develop oil on the land, but failed to do so, and on October 17, 1927, reassigned the leases to McLean. Afterwards McLean continued the operations, bearing all expenses, and on March 18, 1931, brought in a paying well. These operations were all under the lease of July 27, 1918, supplemented by the leases of March 31, 1919. On March 19, 1931, McLean assigned the leases to Yount-Lee Oil Company, which company continued the developments. This suit was filed against McLean and Yount-Lee Oil Company on December 22, 1932, which was almost fifteen years after the plaintiffs made their subscriptions to Well No. 3, and nearly fourteen years after the lease under which that well was drilled became forfeited by its own terms for lack of operations thereunder.

▌Plaintiffs' claim is apparently predicated upon the contention that McLean when he took the lease of July 27, 1918, was acting in a trust capacity, that in taking the lease in his own name he violated his duties and obligations as a trustee; and that because he thus acted in bad faith towards plaintiffs, the lease of July 27, 1918, became impressed with a trust in their favor. Just what interest they had in said lease under such a theory they never do make clear. It seems to us that the preceding statement makes it plain that this claim is not well founded. As pointed out above, the agreement of January 4, 1918, when interpreted in the light of the prior dealings between the parties, meant nothing more than that these parties were mutually contributing to a capital fund of $18,000.00, to be used for "development work," with the understanding that if the venture (Well No. 3) was successful, they were to become joint owners of the lease in proportion to their contributions; a corporation to be formed as their representative for holding the lease and conducting operations thereunder. It is not disputed that this capital was entirely exhausted in drill-

ing Well No. 3, which was a dry hole. Plaintiffs knew as well as McLean that further development was essential if they were to preserve any rights under the leases of January 4, 1918. McLean acted in perfectly good faith in reporting the outcome as to Well No. 3, and afforded plaintiffs an opportunity to join with him in further development on the same terms agreed upon for Well No. 3. They failed to join with him. McLean was under no obligation to keep the lease alive at his own expense for plaintiffs' benefit. Plaintiffs had received full value for everything they contributed under the agreement of January 4, 1918. They knew that if they were to acquire any further rights under the leases they must contribute their part in development, to the end that the leases could be kept alive by the discovery of oil.

Instead of the facts showing that McLean dealt unfairly with plaintiffs in obtaining the lease of July 27, 1918, they show exactly the contrary. It was expressly provided in that lease that it should not become effective until the prior leases had become forfeited. After forfeiture of the leases of January 4, 1918, if not before, plaintiffs were charged with knowledge of the lease of July 7, 1918, and the lease of March 31, 1919, as both were of record. It is thus shown that McLean was attempting to preserve the rights of himself and his friends under the leases of January 14, 1918, so long as there was a possibility of keeping same alive by drilling upon a subscription basis. In addition McLean appears to have dealt fairly with his associates in all other respects. He gave them a chance to join with him in drilling Well No. 4. He allowed them a capitalization of $6000.00 for salvaged material from Well No. 3. After abandonment of the leases he paid them the sum of $3630.09 for the salvaged materials, and advised them that the leases had been forfeited, except as to certain small tracts which he had reserved for the shareholders of Well No. 3. Plaintiffs accepted their proportionate part of the $3630.09, and accepted their interests in the reserved tracts. Undoubtedly this settlement of all rights growing out of the agreement of January 4, 1918, was done with full knowledge of the facts, and by it plaintiffs became bound when they accepted the benefits of the settlement. In addition, plaintiffs allowed the Sun Oil Company and McLean to conduct drilling operations on the land at their own expense for a period of about twelve years, without making any inquiry, or offering to do anything in the way of making contributions to the expense of drilling.

■ It occurs to us that plaintiffs have paid no consideration whatever upon the basis of which a trust,, either resulting or constructive, could arise with respect to the lease of July 27, 1918, or the lease of March 31, 1919. Mr. Pomeroy in his Equity Jurisprudence (Fourth Edition), Volume 3, Section 981, clearly demonstrates that the underlying principle upon which all implied, resulting, or constructive trusts are based is the "equitable doctrine concerning *consideration*." Furthermore, we think that if plaintiffs, under any conceivable theory, had a cause of action it was undoubtedly barred by limitation. This is fully discussed by the Court of Civil Appeals and need not be discused here.

For the reasons stated herein the judgment of the Court of Civil Appeals is affirmed.

Opinion adopted by the Supreme Court December 2, 1936.
Rehearing overruled January 27, 1937.