### SIMMONS v. WILSON et al.
### No. 12332.

Court of Civil Appeals of Texas. San Antonio.

June 18, 1952.

Rehearing Denied July 16, 1952.

Kemp, Lewright, Dyer & Sorrell, Corpus Christi, Thompson, Knight, Wright, Weisberg & Simmons, Dallas, Gus L. Kowalski, Kingsville, for appellant.

Tarlton & Hale, Corpus Christi, Charles G. Lyman, Corpus Christi, Shank, Dedman & Payne, Dallas, for appellees.

NORVELL, Justice.

This appeal is closely related to that decided by the Waco Court of Civil Appeals under the style of Simmons v. Wilson, opinion reported in 216 S.W.2d 847. The suit was originally tried in 1948, judgment being rendered in February of that year. The jury answered certain issues relating to the controversy between Jay Simmons and H. A. Porter and others, but failed to answer issues submitted in connection with the controversy insofar as it involved Simmons and Sam E. Wilson, Jr., and his corporation, S. E. W. Oil Corporation. A severance was ordered and judgment rendered in favor of Porter et al. The case between Simmons, on one hand, and Wilson and S. E. W. Corporation, on the other, was again tried and resulted in a jury disagreement.

The present appeal is from a summary judgment rendered in accordance with the provisions of Rule 166–A, Texas Rules of Civil Procedure. In their motion, appellees adopted as a part thereof the statement of facts or transcript of the evidence made in connection with the 1948 trial. Appellees' contention, which was accepted by the trial court, was that appellees were entitled to judgment as a matter of law despite the testimony of Simmons, particularly the part thereof relating to a purported conversation with Wilson on February 25, 1943. The legal situation is essentially the same as if the trial court had rendered judgment for Wilson and S. E. W. Oil Corporation in 1948, despite the jury's failure to agree upon certain issues. In other words, if an instructed verdict upon the 1948 record could have been sustained, then the motion for summary judgment was properly rendered as the transcript of the evidence made in 1948 is an exhibit to said motion. In stating the facts we refer for the most part to the 1948 statement of facts. In passing upon the evidence as set out therein, the familiar rule is applicable, i. e., we are required to view the same in the light most favorable to the losing party below and resolve all conflicts in his favor.

The judgment rendered below impressed a constructive trust in favor of appellees, Sam E. Wilson, Jr., and S. E. W. Oil Corporation, in and to certain interests under an oil and gas lease held by appellant, Jay Simmons, and covering Survey 43, originally patented to Pedro Ramos, and containing 160 acres of land in Kleberg County, Texas.

The holding of the trial court was that there was no genuine issue of fact in the case despite the fact that Simmons stated and Wilson denied that on February 25, 1943, in a conversation between the two, Wilson said, in effect, that he would not proceed further with the prosecution of a joint venture in which he and Simmons were then both engaged.

In the present litigation, we do not consider that the position of S. E. W. Oil Corporation, a legal entity controlled and dominated by Sam E. Wilson, Jr., differs substantially from that of Wilson as an individual. For present purposes, it may be conceded that S. E. W. Oil Corporation should be awarded equitable relief establishing its asserted overriding royalty as were the other royalty owners, if such right be not defeated by Wilson's position supposedly taken on February 25, 1943. The same may be said of Wilson's individual claim in and to the working interest under the lease involved.

We shall not attempt a complete statement of the factual events leading up to this controversy, but will refer to the opinion of the Waco Court for that purpose. We take up the narrative on February 25, 1942, the date Wilson contends he became a partner or co-adventurer with Simmons.

At that time, the Heman-Craig lease (referred to by the Waco Court as the H-C lease) had terminated by reason of nonpayment of delay rentals. Simmons then negotiated with Edward, John and Mary Rawlinson, children of William and Ida Rawlinson, and secured a lease covering Survey No. 43, dated February 25, 1942, and a lease covering Survey No. 44, Ricardo Gutierrez, original patentee, dated February 26, 1942. Simmons and Wilson agreed to own the working interest jointly and to reinstate the overriding royalty owners under the Heman-Craig lease, insofar as Survey 44 was concerned.[1] The section number used in the Heman-Craig lease was No. 44. At this time there was in existence a title complication or dispute between the Rawlinsons and the King Ranch, a corporation. The number 44 had been used in a deed of conveyance from Robert J. Kleberg to William and Ida

Rawlinson in 1896, but the grantees had gone into possession of Survey No. 43. It seems that Simmons and Wilson contemplated settling this title matter by suit or otherwise, but a year later this had not been accomplished.

On February 25, 1943, Simmons, according to his testimony, came to Corpus Christi to see Wilson and make arrangements to pay delay rentals upon the leases above mentioned. Simmons' testimony as to the disputed conversation may be set forth as a dialogue with minor paraphrasing, as follows:

"Simmons: The delay rental (on the Rawlinson leases) is due today, and, instead of mailing it out to them, I think we should go over there and have a talk with Ed Rawlinson at the time we pay, for, although we have no direct obligation (to drill), we are going to develop it as soon as we can and I would like to explain what we are doing.

"Wilson: Jay, you sure have handled this thing in a slipshod manner. You haven't filed suit and these leases are a year old now. You haven't done a thing. It is just in the same status it

---

[1]. According to Simmons, he accepted Wilson as a co-owner and co-adventurer with some protest and only after considerable argument. His account of the conversation which took place in February, 1942, reduced to a colloquy, was as follows:

"Wilson: Now, I tell you what I would like to do. I have been thinking this matter over. You have acquired this lease from me, from my company, S. E. W., in which we retained the override, my associates and I. I tell you what I would like to do, Jay. I would like to get in on this deal on a personal basis.

"Simmons: What do you mean, Sam, on a personal basis?

"Wilson: Well, I would like to come back in and be your partner and own half of the working interest with you, one of them has the overrides in it, and we will put the overrides back on 44, and I would like to own half the working interest in that with you subject to the overrides, and on the new lease you have on 43, I would like to own that just without any overrides, half the working interest.

"Simmons: Well, Sam, your Company has your override, and I would like to continue on as I am, and I have agreed to work the thing out with the Rawlinsons and defray all these expenses, and I think quite a bit of the lease, although it is a mile and three-quarters or two miles from production, it is on trend and I think quite a bit of it, and I don't want to do it.

"Wilson: Well, you never did get into it or find out about it, except through Survey 44 you got from me, and if I was in your position I would certainly put you in and I don't understand your attitude if you don't, and there will be other deals besides this.

"Simmons: All right, if that's the way you feel about it. What is your suggestion?

"Wilson: All right, what did you give for it, you say?

"Simmons: I gave $800.00.

"Wilson: I will return you half your money then, and we will just own it.

"Simmons: All right, Sam, if that's the deal, it isn't my suggestion, and I don't like it but that's the way you put it up I will let you in."

was on the 25th (of February, 1942).

"Simmons: That is true, but Mr. Rawlinson doesn't want a lawsuit with them if we can avoid it, with the King Ranch and Humble, and I have discussed it with my attorney and he is looking the thing over and is carrying on negotiations, and he says the King Ranch and the Humble people would be the last people to want a lawsuit with so long as there is a chance to get a lease from them without that. I was just following his advice in the matter and also the wishes of Mr. Rawlinson. It is getting nowhere, but I think it is better to negotiate.

"Wilson: Well, I don't agree with you and I think something ought to be done, build a fire or get somebody out there and get a suit filed.

"Simmons: I'm not going to agree to have a suit filed as long as the attorney said not to.

"Wilson: I'm not going ahead with it any longer the way you are handling it. You turn that thing over to me and let me take those leases and I will show you how to get the job done. I will get a fire built under them and bring a suit and clear it up, and you can take an oil payment, hold a retained oil payment, and assign those leases to me and we will get them and you will wind up with an oil payment; you will have nothing further to do with it, and I will work it out.

"Simmons: Sam, that is ridiculous. I gave you that half interest in each of those leases and we talked about it for thirty minutes before I agreed to do it and I would have nothing left out of it for that four hundred dollars, just nothing other than just I had thrown it to you.

"Wilson: Yes, but you will have your oil payment.

"Simmons: I'm not going to do that, I wouldn't think of it.

"Wilson: I'm not going to throw in another dollar. *I'm through with the whole matter* and am going to charge it off on my income tax.

"Simmons: I wish you wouldn't do that.

"Wilson: I most certainly will.

"Simmons: After we have gone this far, you are telling me you are going to get out of this?

"Wilson: *I certainly am unless you turn it over to me and let me handle the leases and let me handle them as I see fit.* You have dilly-dallied with it.

"Simmons: I will tell you right now I'm not going to do that.

"Wilson: All right, you have my answer.

"Simmons: Do you really mean that?

"Wilson: I most certainly do.

"Simmons: Well, Sam, I think that is a terrible mistake,—you have gone this far—to take that attitude at this date.

"Wilson: I would be the judge of that.

"Simmons: All right, if that is your position."

As to Wilson's attitude, Simmons said that, "He was mad and very griped because I didn't turn the whole lease over to him and let him have it and retain an oil payment and let him handle it as he saw fit."

Simmons testified that after the conversation above detailed he left Wilson's office and went to Kingsville to see Ed Rawlinson. He told Rawlinson what had transpired in Wilson's office; that Wilson had stated that he would not pay the delay rentals and was through with the deal. Simmons said that under the circumstances he did not wish to pay the rentals but would like to take a new lease on Survey No. 43, that he didn't care to go ahead with Survey No. 44, but would clear up the title and develop Survey No. 43. This was agreeable with Rawlinson. The parties waited until the depository bank, named in the February 25, 1942, lease had closed for the day so as to ascertain whether or not Wilson would change his mind and pay the rentals. The delay rentals, however, were not paid and a new lease, bearing date of February 26, 1943, was signed by the Rawlinsons.

According to Simmons, he heard nothing further from Wilson about the matter until April 27, 1945, after he had drilled a well on Survey 43 to a depth of more than 7100 feet and cored an oil sand.

The title complication with the King Ranch was cleared up by that company's conveying Survey No. 43 to the Rawlinsons and receiving a conveyance of Survey No. 44. Simmons released all oil and gas leases standing in his name, and after the exchange of conveyances between the Rawlinsons and the King Ranch received a new lease dated December 15, 1943. This lease was perpetuated by production during the spring of 1945.

■ Appellees seemingly concede that assuming that the conversations of February 25, 1943, between Simmons and Wilson took place as testified to by Simmons, the partnership or joint venture theretofore existing between the parties was dissolved. However, they contend that mere dissolution of a partnership does not release the parties from the obligation to act toward one another according to the finer loyalties exacted by the courts of equity, but that this duty remained until the partnership affairs had been wound up. This proposition can hardly be gainsaid and appellants cite the following authorities in support thereof: Karrick v. Hannaman, 168 U.S. 328, 18 S.Ct. 135, 42 L.Ed. 484; Zimmerman v. Harding, 227 U.S. 489, 33 S.Ct. 387, 57 L.Ed. 608; Rossmore v. Commissioner of Internal Revenue, 2 Cir., 76 F.2d 520; Fouchek v. Janicek, 190 Or. 251, 225 P.2d 783; 40 Am.Jur. 312, § 264.

It is asserted that the affairs of the partnership were not settled; that the clearing of title to the tract described in the leases had been assumed by Simmons and Wilson and had not been completed; that Simmons utilized the good will of the partnership of Wilson and Simmons in securing the new lease of February 25, 1943; that except for the existence of the lease of February 25, 1942, and its provisions for being kept in force by the payment of delay rentals, Simmons probably would not have been able to secure a new lease from the Rawlinsons upon the payment of a consideration of $800, and that

Simmons therefore made use of assets and properties of the partnership in order to obtain the new lease and should therefore be held accountable. MacDonald v. Follett, 142 Tex. 616, 180 S.W.2d 334; Drummond v. Batson, 162 Ark. 407, 258 S.W. 616; Spiess v. Rosswogg, 48 N.Y.Super.Ct. 135; Sorenson v. Nielsen, Sup., 240 N.Y.S. 250.

■ This argument overlooks certain highly pertinent matters testified to by Simmons relative to the occurrences of February 25, 1943. According to this testimony, both Wilson and Simmons knew that the subject matter of the partnership or joint venture would cease to exist on that day unless delay rentals were paid. The purpose of Simmons' calling upon Wilson was to make arrangements for the payment of such rentals. Wilson refused to go forward with Simmons upon a fifty-fifty basis and pay his proportionate part of the rentals, but insisted that Simmons turn over to him the complete management of the leases and accept an oil payment in lieu of the one-half of the working interest in the leases which were then held in Simmons' name. Wilson stated his demands in the form of an ultimatum and as a requirement for his continued participation in the venture. When this proposition was refused by Simmons, Wilson took an *ohne mich* or "count me out" position. Under these circumstances, Simmons was not guilty of a breach of duty to Wilson in failing to pay the delay rentals under the leases of February 25th and 26th, 1942, nor in negotiating a new lease for his sole benefit. Ebberts v. McLean, 128 Tex. 573, 98 S.W.2d 352; Green v. Hall, Tex.Com.App., 228 S.W. 183; Keystone Production Co. v. Pace, Tex.Civ.App., 41 S.W.2d 731, wr. ref.; Collins v. Gee, Tex.Civ.App., 107 S.W.2d 754; wr. ref.; Collins v. Collins, Tex.Civ.App., 154 S.W.2d 210, ref. w. m.; Dunfee v. Terwilliger, 9 Cir., 15 F.2d 523; Chittenden v. Witbeck, 50 Mich. 401, 15 N.W. 526; Tygart v. Wilson, 39 App.Div. 58, 56 N.Y.S. 827, 828; Wetzel v. Jones, 75 W.Va. 271, 84 S.E. 951; Westerman v. Dinsmore, 68 W.Va. 594, 71 S.E. 250.

As to the S. E. W. Oil Corporation, it follows that under Simmons' version of the various transactions between him and Wil-

son, the owner and president of the corporation, said corporation can have no valid claim to an overriding royalty interest in the lease covering Survey No. 43. At the time of the inception of the partnership in February of 1942, Simmons agreed that the overriding royalty interest of the S. E. W. Corporation should apply to Survey No. 44 only. At this time, Wilson and hence his corporation knew of the Rawlinson-King Ranch title complication, and that in all probability the section owned by the Rawlinsons was Survey No. 43, rather than Survey No. 44. This was knowledge not possessed by the other holders of overriding royalties and distinguishes their legal position from that of the S. E. W. Oil Corporation. No one paid the delay rentals on the lease covering Survey No. 44 and it thereupon lapsed on February 26, 1943.

■ Under the applicable rules, it can not be said that there is no genuine issue of fact in this case, and it follows that the trial court erred in granting the motion for summary judgment.

The case will be remanded for trial of the disputed fact issues.

Reversed and remanded.