$$\frac{113 \quad 261}{124 \quad 568}$$

## LONG *v.* EVENING NEWS ASSOCIATION.

1. FRAUDULENT CONVEYANCES—EVIDENCE—LIBEL—MALICE.

   Evidence that a demand for the retraction of a libelous article was not complied with by the publishers is inadmissible in garnishment proceedings based upon the alleged fraudulent transfer of the newspaper assets pending an appeal from a judgment for the libel, since the inference of malice to be drawn therefrom would go no further than the judgment itself towards showing a motive for a fraudulent disposition of the property.

2. TRIAL—ARGUMENT OF COUNSEL—PREJUDICIAL REMARKS.

   That one is the managing director of a newspaper will not justify counsel in referring to him, in garnishment proceedings for the amount of a judgment against the paper for libel, as the man "who sits in his sanctum, where nobody can see the hand that writes, nobody can see the brain that works, and writes sensational articles against citizens of his own town, as he wrote the article on which this judgment was rendered," where the fact that such person had nothing to do with the publication of the libelous article is established by the court's having directed verdict in his favor in the original suit.

3. FRAUDULENT CONVEYANCES—CONSIDERATION.

   The fact that the tangible assets of a newspaper, whose transfer of all of its assets to another paper in payment of a debt is attacked as fraudulent by a judgment creditor, did not exceed in value the amount of the indebtedness, will not necessarily relieve the assignee from liability in garnishment, where no account was taken of intangible assets. GRANT, J., and LONG, C. J., dissenting.

4. SAME—INTANGIBLE ASSETS—PERSONAL FRANCHISE—GOOD WILL.

   That a franchise of the assignor in the Associated Press was transferable only with the consent of the association, and that its business had for several years been conducted at a loss, is insufficient to show that the franchise and good will were properly disregarded in the transaction as of no value; it being for the jury to determine, upon proper evidence, whether their inclusion without compensation was in fraud of creditors. GRANT, J., and LONG, C. J., dissenting.

Error to Wayne; Aldrich, J., presiding. Submitted February 11, 1897. Decided May 28, 1897.

Garnishment proceedings by John H. Long against the Evening News Association, as garnishee of the Tribune Printing Company. From a judgment for plaintiff, the garnishee defendant brings error. Reversed.

*Elliott G. Stevenson*, for appellant.

*Levi T. Griffin* and *C. E. Warner*, for appellee.

GRANT, J. Plaintiff recovered a judgment in a libel suit against the defendant Tribune Printing Company, December 18, 1894. The case was affirmed in this court December 3, 1895. See 107 Mich. 207. December 9, 1895, execution was issued and returned unsatisfied. January 21, 1896, plaintiff instituted this proceeding in garnishment against the Evening News Association, which filed a disclosure that it had no property, money, or effects in its hands belonging to the Tribune Company. In February and March, 1895 the Tribune Company had sold and conveyed to the News Association all its property and assets. The theory of this suit is that these conveyances were fraudulent as to the creditors of the Tribune Company, and that therefore the News Association held the property in trust for said creditors. Plaintiff recovered verdict and judgment. Such further facts as are essential will be stated in connection with the points discussed.

1. One of the counsel for plaintiff, in his argument, used the following language:

"Mr. Scripps supposed he could sit in the Tribune room or the Evening News room and blacken the character of a respectable citizen. You find him sitting in his sanctum, where nobody can see the hand that writes, nobody can see the brain that works, and there he scribbles and writes sensational articles against citizens of his own town, as he wrote the article on which this judgment was rendered. Now, gentlemen of the jury, Mr. Scripps

has set out—*First,* as the evidence shows, to libel John H. Long; *second,* to procure able counsel, as he testifies to himself, to defeat John H. Long upon the trial of the case.   In that he failed to succeed.   And it appears, on a trial by jury and by the highest court in the State, it was adjudicated that James E. Scripps did libel John H. Long, and he ought to pay the amount of judgment for it.   Mr. Scripps says, 'I will go before another jury and another judge, and I will get another counsel, and I will yet defeat John H. Long so far as his ability to secure any payment of the debt is concerned.'   James E. Scripps, known in this community as a large-moneyed man, now comes into this court to defeat a policeman who worked for two or three dollars a day, and defeat him against a judgment which he had obtained."

In view of the fact that Mr. Scripps had nothing to do with the publication of the libelous matter, and that for that reason the court, in the libel suit, directed a verdict in his favor, the impropriety and injustice of the language are apparent.   Its natural tendency was to greatly prejudice the jury.   Its use cannot be defended upon the ground that Mr. Scripps owned most of the stock of the company, and was the managing director, and that therefore "theoretically it was his hand that wrote" and "his brain that worked."

2. Counsel were permitted to show that plaintiff had demanded a retraction of the article before he brought his libel suit, and that no retraction was made.   Counsel seek to defend the admission of this evidence under the liberal rule applicable to cases where fraud is charged, and they insist that in some manner it tended to show a motive for the transfer.   We think that this testimony was incompetent and immaterial.   The record contains no evidence tending to show that the sales to the News Association were made with any reference to the plaintiff's suit, which was then pending in this court.   If plaintiff has a right of action against the defendant, it is because the law attaches a liability from the undisputed facts, and not because of any intent to defraud; or, to state

the proposition otherwise, the transaction is a fraud in law, but not in intent.

3. James H. Stone, a former publisher of the Tribune, was called as a witness for plaintiff. He testified that, when he was connected with the Tribune Company, it had the franchise of the Western Associated Press, as did also the Free Press; that in January, 1891, when he sold out the establishment to Mr. Scripps, the circulation of the daily was 12,000 to 13,000, and of the weekly somewhat in excess of that; that the sale carried with it the entire property and "good will of the institution;" and that the price, including the liabilities assumed by the purchaser, was $90,000. The price paid was promptly held by the court to be incompetent. On cross-examination the witness testified that, during the 4½ years of his management, the company had lost $37,000, and said:

"It is difficult to state what the good will of a paper might be worth, suppose the paper had lost eight or nine thousand dollars a year for four years, and then continued to lose for four years more. Conditions surrounding a newspaper affect its value, and franchises might increase or decrease the value, without reference to the actual earning results. A franchise could be transferred subject to the confirmation of the association. I think, if the Tribune Company were hard up, or another newspaper company, my judgment would be that the franchise would be of value for the purpose of sale by the company. Its transfer would be subject to the confirmation of the association to which it belongs. It requires consent."

It had already appeared in the case—and is undisputed —that for four years after the sale by Stone, and to the time of the sale to the defendant, the Tribune Company had lost about $100,000. The following questions were then propounded and answered:

"Q. And with a paper that has lost money during your experience, as you have stated, and lost during the next four years an amount exceeding $100,000, and was then without resources of its own, what would you say, as a newspaper man, as to the fairness of an arrangement by which its assets and property of all kinds was trans-

ferred to the News Association, to furnish the capital and conduct the paper, and return to the stockholders one-half of any profits made?

"A. I can't judge whether it would be fair and reasonable without a knowledge whether it was the best thing that could be done. If nothing else could be done, and the concern was unable to continue, it might be the wisest course. At the same time it might have been possible to have sold the paper for more than they realized in that way.

"Q. Do you think it possible to sell a paper that has lost in eight years $150,000, and is then in debt sixty-five to seventy thousand dollars, with tangible assets of less than one-half that amount?

"A. I think such things are done at times when the fool-killers are asleep. Such things are not very rare."

On redirect examination he was asked to give what he regarded as the elements of value in a newspaper, to which he replied:

"First, I should regard field and opportunity; second, good will; third, condition of organization of the enterprise. That would include most everything, like its franchise, etc."

Under objection and exception the witness was then asked:

"Q. You know what the Associated Press is and you have already stated what it is. What, in your judgment, would be the value of a franchise, in the city of Detroit, like the Associated Press or the Western Associated Press,—either of them?

"A. It might be worth more to you than to me. All those matters come, to a certain extent, under the head of opportunity and the capacity to make use of. I have known times in the last 10 years when I should regard the value of the Associated Press franchise in the city of Detroit worth $100,000. (Stricken out on motion. Question read.)

"Q. Confine your answer to January, 1895.

"A. I should regard a franchise in the Associated Press as worth all the way from $20,000 to $100,000, according to the circumstances of the business and the opportunity and capacity of the purchaser to use it."

We do not think that this opinion of the witness was competent. His opinion was but a mere guess, and furnished an opportunity for the jury to guess. Outside the value of this franchise, there was no evidence to show that the tangible assets of the Tribune Company were worth any more than the price paid for them and credited on the debt due from that company to the News Association.

4. The learned trial judge, after instructing the jury "that, if such transfer [of the tangible assets] was a *bona fide* conveyance of such property for an adequate price to satisfy an actual indebtedness, then such transfer would be valid, even though its effect would be to defeat the other creditors of the said the Tribune Company," instructed them as follows:

"If you find that thereafter the Tribune Company possessed no other valuable property interests, rights, and franchises than the good will of its business and contracts with news associations, then the defendant would be entitled to a verdict, because such property would not be subject to levy and sale under a writ of execution, and even if you should believe that it was transferred to the Evening News Association for the purpose of defrauding the creditors of the Tribune Company, yet it is not such property that, when separated from the tangible assets, can be reached in proceedings of this kind. And there is no proof that any profits have accrued to the defendant by the use of such good will and franchises."

While the good will of such a business and the franchise of the press association may be the subject of contract between vendor and vendee, it needs no argument to demonstrate that a judgment creditor cannot get title to either by an execution sale. The judgment creditors may sell all the printing presses and other personal property, but the purchaser would not thereby acquire the right to publish the Tribune and receive the benefits of the good will and franchises of the business. The company might at once purchase or rent new presses, etc., and continue its publication. The entire assets of a partnership may be sold on execution, but the sale does not carry with it the

good will of the firm.    Nearly all the cases cited by coun-
sel relate to the rights of partners *inter sese.*    There are,
of course, cases where the good will attaches to the prop-
erty itself, and not to the business or partnership.    In
such case the business and the property are inseparable.
*Chittenden* v. *Witbeck,* 50 Mich. 420.    In *Wedderburn*
v. *Wedderburn,* 22 Beav. 84, it was held that the good
will of a business does not belong to the surviving part-
ners except by express agreement.    See, also, *Fenn* v.
*Bolles,* 7 Abb. Prac. 202.    In *Hathaway* v. *Bennett,* 10
N. Y. 108 ( 61 Am. Dec. 739), it was held that the route of
a newspaper carrier might be the subject of sale, like the
good will of a trading establishment or the ride of a phy-
sician, but it, *ipso facto,* gave the purchaser no right of
action against the publisher.    It is there said:  "A mere
privilege may be the subject of sale if the purchaser is
willing to run the risk of failing to enjoy it."    So this
press franchise would be of no validity or value to the
vendee of the Tribune Company, unless the press asso-
ciation and its members in Detroit consented to the
transfer.    But of what value can the good will and a
nontransferable franchise be to a business which for years
had been losing money at the rate of $25,000 per year?

5. At the time of the transfer, as appears by the evi-
dence in behalf of the plaintiff, the Tribune Company was
indebted to the News Association in the sum of $37,000,
and the jury so found.    There is no evidence that this
was not a *bona fide* indebtedness.    The price of the press
and other property transferred January 11th was $11,000.
The price of the other property transferred in the follow-
ing month was $24,287.95.    These comprised all the
tangible assets of the Tribune Company, and, according
to the undisputed evidence, were worth $35,287.95.    After
that time, and before the writ of garnishment was served,
the defendant had paid other debts of the Tribune Com-
pany, amounting to $30,000.    It thus appears that the
tangible assets of the Tribune Company were not equal to
its debt to the defendant at the time of the sale.    The only

basis on which a judgment in garnishment can be rendered against the defendant is that it had money, property, or effects in its possession or control belonging to the Tribune Company, and which it may produce in response to the writ, or that such property was fraudulently conveyed to it, which it refuses to produce. A defendant in garnishment may either produce the property in his hands or permit judgment to go against him for its value. These assets must be tangible, not intangible. In view of the fact that the Tribune Company had done a losing business, and during the nine years preceding this suit lost about $137,000, it is evident that the mere fact that the good will of the business and the press franchise were not given a value, if they were included in the sale, is not evidence of fraud in the transaction, nor do they constitute tangible assets for which the defendant can be held liable as garnishee.

But the claim is that this franchise and the good will of the business were valuable, and that the jury were at liberty, from this fact alone, to find that the entire transaction was a fraud, and that therefore the tangible assets, which were conveyed to the defendant for their full value, became subject to garnishment. To illustrate: A., a physician, sells to B., another physician, his books, instruments, office fixtures, and accounts for $5,000, their full value, and also conveys to him the good will of his business. C., a creditor of A., may sue A. and garnishee B., and attack the sale as fraudulent, because no price was fixed for the good will of the business. So, too, under the supposed case, if the good will of the business were sold at $1,000, a jury might find the transaction fraudulent, because in their judgment it might be worth $5,000, if they could find another physician to swear that in his judgment it was, and that, too, in face of the fact that A. had not made a living, but had lost money in his practice. I am not aware of any case which holds such a transaction fraudulent, or open to attack by creditors. The purchaser in such case may be

willing to pay even a large sum for the good will, thinking that by his superior skill and energy he may make it valuable; but this is no evidence of its actual value. So the fact that Scripps paid a large amount for the Tribune Company, with its record of losses, is not evidence of the value of its good will or of the press franchise which it had.

It may be proper to here note the transactions between the two companies as they appear upon the records. January 7, 1895, the following appears upon the record of the board of directors of the Tribune Company:

"J. E. Scripps moved that E. B. Whitcomb and George G. Booth constitute a committee to negotiate with the Evening News Association for the sale of the machinery and fixtures to the said Evening News Association, and to establish a rental to be paid to the News for the use of the plant. Adopted. E. B. Whitcomb moved J. E. Scripps and George G. Booth be a committee to submit to an adjourned meeting a plan for the lease of the Tribune to the Evening News Association for the purpose of securing increased economy in the operation of the various departments. Adopted. On motion, the stockholders took a recess for two weeks to await the report of the committee."

On the same day the following action was taken by the board of directors of the News Association:

"On motion of J. S. Sweeney, the salaries of the managing director and manager were made the same as last year. J. S. Sweeney moved that the interest in the engine, boiler, electric plant, and presses now owned by the Tribune Printing Company be purchased at a fair valuation by this association for the simplification of the business, and then the Tribune be charged 10 per cent. upon the said valuation for the use of said plant. Also, that the president and secretary be a committee to arrange the transfer. Carried."

In a few days trouble arose in the Detroit Typographical Union as to the transfer of matter between the Evening News and the Tribune. This resulted in the transfer of the balance of the assets and property of the Tribune

Company to the News Association, under the following resolution, adopted March 6, 1895:

"March 6th. Meeting of directors at the residence of the president. Present: J. E. Scripps, J. S. Sweeney, George G. Booth. Mr. Booth offered the following: ' *Whereas*, in the interests of economical management, the mechanical department of the Evening News and Detroit Tribune have for some months past been operated jointly; and *whereas*, the requirements of the Typographical Union demand entire amalgamation of the two properties, if the existing advantages are to be continued; and *whereas*, the Tribune Printing Company, by its directors, has offered to sell to the Evening News Association the entire printing business, on terms which shall be fixed by the said Evening News Association: *Therefore, resolved*, that we pay the Tribune Company, as consideration for the property turned over to us, one-half the net profits that may accrue from the publication of the morning, Sunday, and weekly issues, until such time as experience may show change or modification in this basis to be wise and just.' Resolution seconded by Mr. Sweeney, and unanimously adopted. It is understood that, in reckoning the profits of the Tribune portion of the business, no account is to be taken of the interest on the Tribune debt, which is to be paid by the Tribune Printing Company.
"On motion the meeting then adjourned.
"GEORGE G. BOOTH, Secretary.
"JAMES E. SCRIPPS, President."

Nothing is said in these sales about the good will of the Tribune Company or the press franchise. If, however, we assume that the Tribune Company intended to convey them, this cannot affect the question. The result did not prove very profitable to the News Association, for it lost $10,000 the first year in carrying out the arrangement. We thus have the Tribune Company, which had always been a losing business, sold by Stone to Scripps; after four years more of failure and heavy losses, sold by Scripps to the defendant; full value paid for all its tangible assets; the sale reasonable upon its face, at least as to the Tribune Company; the Tribune Company still in existence, and entitled to receive from the defendant one-half the net profits which may result from the publication

of its issues; and a jury permitted to find the transaction fraudulent upon the opinion of a witness who testified that it might be possible to sell a newspaper in the condition in which this was, "when the fool-killers are asleep." I cannot yield assent to such a doctrine. The fact that a great majority of the stock of both corporations is owned by the same parties does not of itself stamp as fraudulent, either in fact or law, a transaction otherwise fair. It is not a fraud *per se* for one corporation, a debtor, to transfer its property to another corporation, its creditor, in payment of its debt, where there is no great undervaluation of the property. *Spear* v. *Rood*, 51 Mich. 140; *Fraser* v. *Passage*, 63 Mich. 556. We are aware of the rule found in the following cases: *Cole* v. *Millerton Iron Co.*, 133 N. Y. 164 (28 Am. St. Rep. 615); *Montgomery Web Co.* v. *Dienelt*, 133 Pa. St. 585 (19 Am. St. Rep. 663); *Grenell* v. *Gas Co.*, 112 Mich. 70; but they do not apply to this case, where full value was paid for the property.

Upon this record the court should have directed a verdict for the defendant.

Judgment reversed, and new trial ordered.

LONG, C. J., concurred with GRANT, J.

HOOKER, J. I concur in the reversal of the judgment in this cause. It was not disputed that the plaintiff recovered a judgment against the Detroit Tribune Printing Company for libel. It was not denied that all of the assets of the Tribune Printing Company were assigned to the Evening News Association. The issue in the case was whether such assignment was a *bona fide* transaction, upon a sufficient consideration, and free from fraud of which its creditors could complain. This issue the defendant had a right to suppose would be tried upon its merits, and it was under no obligation to try any other issue, or to be subjected to the danger of jurors' prejudices being aroused by evidence relating to other matters, or by unwarranted appeals by counsel. Counsel

insisted on showing, by cross-examination of Mr. Scripps, who owned the majority of the stock in each company, that the plaintiff had asked the Tribune Company to retract the libel which was the foundation of his judgment, and that it had never been done. It is now said that this testimony tended to show malice and vindictiveness upon the part of the Tribune Company. If there was a demand of retraction, which was not complied with, it is reasonable to suppose that it was not lost sight of in the trial of the libel case, and doubtless is to be found duly charged against the company in that judgment, which conclusively settled the question of malice against the company. The only possible view that would justify this evidence is that it had some influence upon the Tribune Company in the way of prompting it to fraudulently dispose of its property with a design to prevent the collection of the judgment, and we think the inference of malice or vindictiveness to be drawn from a failure to retract would not go any further in that direction than would the judgment itself. Apparently counsel for the plaintiff did not offer it for this purpose, for not only did he not give that reason for offering it, but he objected to the defendant's going into a rebuttal of the alleged claim of malice or vindictiveness, which it clearly had a right to do if it was a vital question in the case. This examination, and the manner in which it was conducted, was, in our opinion, well calculated to prejudice the defendant with the jury, and the judge should not have permitted it.

The same may be said of the language of counsel in criticising the witness Scripps. We are disposed to make all reasonable allowances for professional zeal, but we think this was not justified by any evidence in the case; and, if it was of any value to the plaintiff in the case (as we are bound to suppose that counsel considered it to be), it was rather in the direction of arousing the indignation of the jurors against Mr. Scripps and his company than in calling their attention to evidence which justified the conclusion that this transfer was made for the pur-

pose of avoiding a judgment of small moment in comparison with the transaction between the companies.

The plaintiff, having garnished the defendant, attacked its purchase of all the assets and property of the Tribune Company as fraudulent, and based the claim of fraud largely upon the proposition that it obtained property in excess of its claim against the Tribune Company. Whether this was true or not depended upon the value of an Associated Press franchise, so called, and the good will of the business, which were acquired by the purchase. It is claimed, perhaps correctly, that this franchise was not property which was subject to execution, being intangible; and it is said that it could not be reached by garnishment because intangible, and not subject to execution. But, if that be conceded, it does not, in my opinion, follow that such of the property as was tangible might not be thus reached. If the transaction was fraudulent, all of the property was taken subject to the rights of creditors. There was testimony tending to show that the press franchise was valuable. If it is a privilege which is essential to a daily newspaper, and one which is granted to but one or two newspapers in a city, it is reasonable to suppose that it would be a privilege much sought; and while it appears that the franchise, being no more than a contract personal in its nature, cannot be used by an assignee without the consent of the press association, it does not necessarily follow that it has no value, because it is possible that it can be made available by obtaining such consent, either under the existing rules of the press association or for a nominal consideration. If, as we gather from the case, this privilege is one that is granted to but one or two newspapers in the city of Detroit, there may be great benefit in obtaining a relinquishment of the right. If the franchise was valuable, there would seem a moral reason why the vendor (a debtor) should apply it to the payment of its debts. It is said that the creditor is not interested in the matter, because

113 MICH.—18.

it is not subject to execution. Were it property exempted by law, we think this would be obvious, under decisions of this court; but we think the law should not erect a barrier against a creditor which has no more substantial foundation than the legal fiction that this right, resting in contract personal in its character, is of no value in the hands of the assignee, when it is obvious that it may be of great value as a matter of fact.

Again, the good will of the Tribune may have been valuable, although intangible, and, if so, its acquisition tended to increase the excess of the value of the property purchased over the purchase price. The effect of the theory of counsel would be to set off the assets called tangible against the purchase price, and to disregard the intangible assets because not subject to attachment or garnishment, although it seems patent that the intangible property may have been of much value. Good will has been frequently held to have value, and to be subject to contract. In *Chittenden* v. *Witbeck*, 50 Mich. 420, it was recognized that it was valuable in connection with an hotel. It was there said: "By good will we suppose must be intended the favor which the management of the Russell House has won from the public, and the probability that the old customers will continue to give it their patronage for the future." It would seem that an established newspaper might have a similar hold upon its patrons. It is not for us to pass upon the merits of this question, which is plainly a question of fact, and is for the jury or trial court.

The judgment should be reversed, and a new trial ordered.

MONTGOMERY and MOORE, JJ., concurred with HOOKER, J.