# Order

**Michigan Supreme Court**
**Lansing, Michigan**

December 11, 2020

Bridget M. McCormack,
Chief Justice

David F. Viviano,
Chief Justice Pro Tem

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

158749
158755-6

BRYAN PUNTURO, FAWN PUNTURO, and
B & A HOLDINGS, LLC, d/b/a PARKSHORE
RESORT, LLC,
        Plaintiffs-Appellees,

v

BRACE KERN,
        Defendant-Appellant,
and

SABURI BOYER and DANIELLE KORT,
f/k/a DANIELLE BOYER,
        Defendants.

_____/

SC: 158749
COA: 338727
Grand Traverse CC: 17-032008-CZ

BRYAN PUNTURO, FAWN PUNTURO, and
B & A HOLDINGS, LLC, d/b/a PARKSHORE
RESORT, LLC,
        Plaintiffs-Appellees,

v

BRACE KERN and SABURI BOYER,
        Defendants,
and

DANIELLE KORT, f/k/a DANIELLE BOYER,
        Defendant-Appellant.

_____/

SC: 158755
COA: 338728
Grand Traverse CC: 17-032008-CZ

BRYAN PUNTURO, FAWN PUNTURO, and
B & A HOLDINGS, LLC, d/b/a PARKSHORE
RESORT, LLC,
        Plaintiffs-Appellees,

v

BRACE KERN and DANIELLE KORT,
f/k/a DANIELLE BOYER,
        Defendants,

SC: 158756
COA: 338732
Grand Traverse CC: 17-032008-CZ

and

SABURI BOYER,
        Defendant-Appellant.

_____/

On November 12, 2020, the Court heard oral argument on the applications for leave to appeal the October 16, 2018 judgment of the Court of Appeals. On order of the Court, the applications are again considered, and they are DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.

CLEMENT, J. (*concurring*).

I concur with the Court's order denying leave to appeal. While the text of the fair-reporting-privilege statute at issue, currently codified at MCL 600.2911(3), is not all that clear, there is reason to believe that the statutory privilege only applies to media defendants, and is thus inapplicable to the instant defendants. When, as here, the Court of Appeals allows a suit to move forward, I am content to deny leave and not have this Court articulate any binding precedent. I write separately to discuss why I believe the statute can be read as inapplicable to defendants *themselves*, in lieu of the Court of Appeals' conclusion that defendants' *remarks* did not factually satisfy the statute's protection, and to ask the Legislature to clarify the intended scope and application of the statute.

The fair-reporting privilege we are concerned with generally protects certain libel defendants from liability so long as what they publish is "fair and true." It was originally enacted in 1931 PA 279, and at that time provided:

> No damages shall be awarded in any libel action brought against a reporter, editor, publisher or proprietor of a newspaper for the publication therein of a fair and true report of any public and official proceeding, or for any heading of the report which is a fair and true headnote of the article published: *Provided, however*, That this privilege shall not apply to a libel contained in any matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of the public and official proceeding which was not a part thereof.

Under this version of the statute, it only applied to newspapers—specifically, "a reporter, editor, publisher or proprietor of a newspaper." They were protected for their reporting on "any public and official proceeding," so long as they provided "a fair and true report" of the proceeding. See *McCracken v Evening News Ass'n*, 3 Mich App 32, 38 (1966) ("The statute protects newspaper publishers if the article is a fair and true report of the public and official proceeding.") This protection included a proviso, however, that it did not extend to "a libel contained in any matter added by any person concerned in the

publication." Thus, media defendants who made "a fair and true report of . . . public and official proceeding[s]" could not add libelous matter to the report—such as defamatory editorial remarks mixed in with the fair and true reporting of what happened—and be insulated from liability.

Were the 1931 language still in effect, we would not be hearing this case—there would be no dispute that it did not protect these defendants, who are not "reporter[s], editor[s], publisher[s] or proprietor[s] of a newspaper." But the statutory language *was* amended, by 1988 PA 396. It now provides:

> Damages shall not be awarded in a libel action for the publication or broadcast of a fair and true report of matters of public record, a public and official proceeding, or of a governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body, or for a heading of the report which is a fair and true headnote of the report. This privilege shall not apply to a libel which is contained in a matter added by a person concerned in the publication or contained in the report of anything said or done at the time and place of the public and official proceeding or governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body, which was not a part of the public and official proceeding or governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body. [MCL 600.2911(3)].

The immunity from damages is no longer specific to newspapers and their employees, but rather applies to any "publication or broadcast" of certain "fair and true report[s]." The amendment also broadened the subject matter of those "fair and true report[s]" beyond "any public and official proceeding," and now includes "matters of public record" or "a governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body." The denial of protection to "a libel contained in any matter added by any person concerned in the publication" was recast as no longer in the form of a proviso, consistent with the modern preference against provisos. See 1A Singer & Singer, Sutherland Statutory Construction (7th ed), § 21:11, p 173 (characterizing provisos as "lazy drafting practice" that "make a statute hard to understand" and "may also produce unanticipated consequences").

Obviously, the deletion of the newspaper-specific language in 1988 PA 396 can be read as broadening the fair-reporting privilege of MCL 600.2911(3) to any "publication or broadcast" of an account of the proceedings listed. Defendants argue accordingly that their remarks to the media—made with the expectation that those remarks would be repeated—qualifies as a sort of publication or broadcast of those remarks. However, I believe there are clues in and around 1988 PA 396 suggesting that the fair-reporting

privilege is only enjoyed by media defendants, and I am consequently content to deny leave in this case and let this suit move forward.

First, the apparent thrust of 1988 PA 396 was the expansion of the fair-reporting privilege's scope beyond an account of "any public and official proceeding" to include "matters of public record" or "a governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body." This expansion was adopted in response to this Court's decision in *Rouch v Enquirer & News of Battle Creek*, 427 Mich 157 (1986). See *Northland Wheels Roller Skating Ctr, Inc v Detroit Free Press, Inc*, 213 Mich App 317, 323 n 4 (1995), quoting House Legislative Analysis, HB 4932 (June 15, 1988) (identifying *Rouch* as the Legislature's motivation for 1988 PA 396 and noting that the legislative analysis called our *Rouch* decision "unduly restrictive"). The *Rouch* plaintiff was arrested for the rape of his children's babysitter, although in the end, charges were not filed against him and in fact charges were ultimately filed against someone else. That said, the day after his arrest, the newspaper reported that he had been " 'arrested and charged with the sexual assault of a 17-year-old women [sic] who was baby-sitting with his children . . . .' " *Rouch*, 427 Mich at 160. The reporter had received this information from the police department, which the reporter would habitually call in the morning to find out what had happened in the last 24 hours. *Id*. at 161. Rouch sued for libel. The newspaper cited the statute as a defense, saying that it had given "a fair and true report" of a "public and official proceeding"—Rouch's arrest and the police understanding of the situation. This Court rejected that argument, concluding "that an arrest that amounts to no more than an apprehension is not a 'proceeding' under the statute," meaning that "the information orally furnished to the defendant in support of it does not, as such, enjoy the privilege afforded by the 'public and official proceedings' statute." *Rouch*, 427 Mich at 172-173. The Legislature then expanded the statute's scope beyond "proceedings" to, among other things, matters of public record—such as the fact of the arrest and the government's understanding of what motivated it. It strikes me as unlikely that the Legislature, in responding to *Rouch*, also intended to overhaul the immunity being conferred by expanding it beyond the journalism context.

Second, 1988 PA 396 applies only to a "publication or broadcast." On the one hand, this is certainly a change from 1931 PA 279, which applied only to newspapers. But it appears to me to be an effort at *modernizing* the fair-reporting privilege rather than changing its fundamental character. The reference to a "publication or broadcast" seems likely to me to be the Legislature's effort at accommodating the substantial changes in major forms of media between 1931 and 1988, in particular the dramatic expansion of radio and television journalism. I can say from firsthand experience in the legislative-drafting process that the Legislature, when it decides to make some substantive change to a law, will often also take up other forms of clean-up, to modernize the law—whether to render the language gender-neutral, move away from disfavored phrasings (such as the use of *shall*), or update a law's text to conform to how it is actually applied. For this

statute to apply to these defendants, it would be more natural for it not to refer to "publication or broadcast" at all, and simply read "[d]amages shall not be awarded in a libel action for a fair and true report of matters of public record" and so on. The fact that, instead, it says that "[d]amages shall not be awarded in a libel action for the *publication or broadcast* of a fair and true report of matters of public record" suggests to me that the Legislature was aiming to protect media defendants which control the means of publishing or broadcasting information.

Third, the statute still requires that the protected communication be a "fair and true report." Because the original statute applied only to newspapers, the "report" mentioned then could have only been a report in the sense of *journalism*. See, e.g., *The American Heritage Dictionary of the English Language* (5th ed) (defining the verb "report" as "[t]o write or provide an account or summation of for publication or broadcast"). In this context, requiring that it be "fair and true" appears to be an allusion to a journalist's professional responsibilities and an effort to avoid protecting "yellow journalism." It seems unlikely to me that the Legislature, in making changes responsive to our *Rouch* decision, also aimed to transform the character of the sort of "report" that the statute shields to include nonjournalistic "reports." This is all the more so since the report still must be "fair and true"—this seems to me to continue alluding to a journalist's professional duties, rather than requiring an inquiry about whether an individual has "fairly" characterized his or her *own actions* to decide whether the statutory protection applies.

Fourth, the Legislature's adjustment of the former proviso also suggests to me that not every change to the text of this statute can be taken at face value, because the change to the proviso has rendered it nearly unintelligible. Under 1931 PA 279, the fair-reporting privilege did not "apply to a libel contained in any matter added by any person concerned in the publication." This was using "matter" in the sense of "[s]omething printed or otherwise set down in writing: *reading matter*." *American Heritage Dictionary*. In this sense, "matter" is roughly synonymous with "content"—thus, it could be rewritten to say that the privilege did not "apply to a libel contained in any *content* added [to the published report] by any person concerned in the publication." In this sense of the word "matter," it is an uncountable noun, and we cannot grammatically speak of "one matter" or "one content" any more than we can speak of "one beef" or "one concrete." Our case reports have many references to "libelous matter" in this sense of libelous published content.[1] After 1988 PA 396, this language now reads, "This privilege

---

[1] See, e.g., *Taylor v Kneeland*, 1 Doug 67, 75 (Mich, 1843), quoting *Thomas v Croswell*, 7 Johns 264, 270-271 (NY, 1810); *Lewis v Soule*, 3 Mich 514, 517, 520-522 (1855); *Leonard v Pope*, 27 Mich 145, 150 (1873); *Scripps v Reilly*, 35 Mich 371, 394 (1877); *Scripps v Reilly*, 38 Mich 10, 25, 29 (1878); *Maclean v Scripps*, 52 Mich 214, 247 (1883); *Peoples v Detroit Post & Tribune Co*, 54 Mich 457, 458 (1884); *Bacon v Mich Central R Co*, 66 Mich 166, 173 (1887); *Park v Detroit Free Press Co*, 72 Mich 560, 569

shall not apply to a libel which is contained in a matter added by a person concerned in the publication." Postamendment, the statute has apparently changed the sense of the word "matter," because it now takes the indefinite article *a* ("contained in *a matter added*") and thus must be a countable noun. The apparent sense of "matter" here may be something like "[a] subject of concern, feeling, or action[.]" *American Heritage Dictionary*. This creates an interpretive problem—how does "a person concerned in the publication" go about adding "a subject of concern" to an account of "a public and official proceeding" or the other activities to which the fair-reporting privilege applies? Should the availability of the privilege turn on whether the report discusses multiple "subjects of concern" as opposed to confining itself to whatever "subject of concern" was the primary motivation of the "public and official proceeding" the report is about? It seems unlikely to me that the Legislature intended to alter the sense of the word "matter"—and thus the scope of this provision—via the insertion of the indefinite article "a" before the word "matter," and create such interpretive challenges. Rather, I suspect that this was a poorly executed effort at eliminating the proviso without intending to change its substantive meaning. And the poor execution of *this* change is a signal to me that many of the *other* changes introduced by 1988 PA 396 should be read as narrowly as the text permits.

I readily acknowledge that each of these observations about 1988 PA 396 is rebuttable. First, while the context of the Legislature's action suggests it was responding to *Rouch* and unlikely to have intended the sort of broadening of this statute that would benefit the instant defendants, *unlikely* is not *impossible*. We have held in the past that the Legislature has made what were likely inadvertent changes with substantive consequences to our laws. See, e.g., *People v Pinkney*, 501 Mich 259 (2018) (suggesting that the Legislature probably inadvertently failed to maintain forgery as a crime under the Michigan Election Law). Second, if you squint, the "publication or broadcast" language could be construed as applying against a speaker or writer as well as a publisher or broadcaster, because a defendant in a defamation suit *can* be held liable for someone else's publication of defamatory remarks if the defendant made the defamatory remarks intending that they be published. Thus, in *Wheaton v Beecher*, 66 Mich 307, 311 (1887), the defendant gave an interview to the *Detroit Evening News* making remarks about the plaintiff, and we held that the defendant could be sued because "[t]here was testimony in

---

(1888); *Smith v Smith*, 73 Mich 445, 446 (1889); *Wheaton v Beecher*, 79 Mich 443, 446 (1890); *Long v Tribune Printing Co*, 107 Mich 207, 215 (1895); *Long v Evening News Ass'n*, 113 Mich 261, 263 (1897); *Burr's Damascus Tool Works v Peninsular Tool Mfg Co*, 142 Mich 417, 421 (1905); *Flynn v Boglarsky*, 164 Mich 513, 516, 518 (1911); *Bennett v Stockwell*, 197 Mich 50, 55 (1917); *Bowerman v Detroit Free Press*, 287 Mich 443, 450-452 (1939); *Powers v Vaughan*, 312 Mich 297, 304-306 (1945); *Sanders v Evening News Ass'n*, 313 Mich 334, 340, 342 (1946); *Davis v Kuiper*, 364 Mich 134, 137-139, 145 (1961); *Bufalino v Maxon Bros, Inc*, 368 Mich 140, 150 (1962).

the case offered by the plaintiff tending to show that the defendant authorized the publication of the libel . . . ." Third, it is not impossible for one to make a "report" about one's own doings. The word can be defined as "[a] spoken or written account of an event, usually presented in detail," *American Heritage Dictionary*, and there is no strictly logical reason one cannot offer such an account of one's own activities. And fourth, the Legislature *could* have meant to change the sense of the word "matter" in MCL 600.2911(3) by inserting the word "a" in front of it, obliging us to (perhaps) determine whether a "report" dared to touch on multiple "subjects of concern" and forfeit the privilege.

Yet while each observation is rebuttable, the combination of them is, in my view, compelling. Beginning from the meaning that 1931 PA 279 had—protecting only media defendants—the fact that 1988 PA 396 only applies to a "publication or broadcast," and still requires a "report," reads to me more like an effort at preserving the statute's application to media defendants rather than eliminating it. This is even more apparent when considering that 1988 PA 396 was prompted by and responsive to our *Rouch* decision, which had nothing to do with the contested aspects of the statute's scope regarding whom the privilege protects (indeed, the defendant in *Rouch* was a media defendant). And the grammatically challenged rewritten proviso both suggests that the statute's text does not reflect the Legislature's intent and counsels against this Court definitively interpreting what may be an effectively "broken" statute, making denying leave here a prudent exercise of our discretionary control of our docket. Moreover, should the Legislature revisit this statute, it would have a chance to review the proper scope of its application in a media environment that has changed dramatically since 1988; the rise of the Internet and the nontraditional journalism it facilitates invites a reassessment of this privilege.

MARKMAN, J. (*dissenting*).

This case involves claims of defamation by plaintiff Bryan Punturo against defendants, Brace Kern, Saburi Boyer, and Danielle Kort. The Court of Appeals affirmed the trial court's holding that defendants' statements to the news media concerning their antitrust lawsuit against Punturo were not protected under the fair-reporting privilege, MCL 600.2911(3). Because I would conclude that the statements fall within the protections of the fair-reporting privilege, I respectfully dissent from this Court's order of denial. Instead, I would reverse the Court of Appeals and remand to the trial court for entry of an order granting summary disposition in favor of defendants.

Punturo owns ParkShore Resort on Grand Traverse Bay, and Boyer owns a parasailing business on a beach near the resort. In 2014, Boyer signed a "Parasailing Exclusivity Agreement," wherein he agreed to pay $19,000 per year to Punturo for three years. In exchange, Boyer would buy parasailing equipment from Punturo's son and Punturo would not compete with Boyer's business. When Boyer stopped making

payments in accordance with the agreement, Punturo allegedly threatened Boyer and his then wife, Kort, demanding that they continue payments. After one allegedly threatening e-mail from Punturo, Boyer contacted Kern, a local attorney. Kern believed that Punturo had violated the Michigan Antitrust Reform Act, MCL 445.771 *et seq.*, and reported the findings to the Michigan Attorney General. Soon thereafter, the Attorney General investigated Punturo and filed a criminal extortion charge. Boyer and Kort then retained Kern to file a lawsuit against Punturo, alleging antitrust violations, extortion, and intentional infliction of emotional distress.

While this lawsuit was pending, Kern and his clients spoke to certain news outlets about it. According to the complaint, some of Kern's statements to the media were reported as follows:

> "Kern said the correspondence proved Punturo flagrantly violated state antitrust laws." "The contract itself is an agreement to limit competition," Kern said. "So that violates the (Michigan) Antitrust Reform Act in [and] of itself."

* * *

> Kern called the charge against Punturo "a long time coming" for Boyer and Boyer's wife. "It's a vindicating day for my clients," he said. "There was extortion for the past two years."

* * *

> The Boyers' civil attorney, Brace Kern, says, "Extortion is one aspect of our case, but ours seeks to prove that the unlawful contract that Mr. Punturo extorted my clients into the signing anti-trust laws [sic] and there's also a claim for intentional affliction [sic] of emotional distress."

* * *

> Brace Kern represents Traverse Bay Parasailing, saying Punturo violated anti-trust laws and caused emotional distress. "Today is a vindicating day for my clients, and it's been a long time coming. They are glad that the attorney general takes anti-trust violations and extortion seriously. This is something that I don't think Traverse City needs or wants, so it's nice to see them put an end to this conduct," says [Kern].

* * *

> Attorney Brace Kern represents the alleged victim—Saburi Boyer—in an ongoing civil case. "Essentially what he did was tell my client, 'Give me $19,000 a year or I'm going to run you out of business with unfair competition . . . below cost prices,' ["] says Kern. Kern says Punturo threatened in telephone messages to "make your life a living hell."

* * *

. . . "As soon as I saw the contract, I'm like, 'This is an antitrust violation, this is a covenant not to compete, this is extortion,' ["] Kern said.

In addition to Kern's statements, Boyer also provided a number of statements to the media concerning the lawsuit:

> Boyer maintains he wasn't trying to corner the market and that he only paid Punturo out of fear. "I felt like I was being extorted through this entire timeline," Boyer said. "When I was going through it, I felt like it was going on every day."

* * *

> "He basically ran over me verbally, and I froze," says Boyer. "My wife told me I turned white as a ghost. I froze up, didn't have much at all to say, [h]e told me he was going to make my life a living hell, that he was going to crush me and everything that mattered to me, and that he was going to bury me by the end of this. I just froze up and took it. I realized that he was very motivated to hurt me. Whether that was business or personal, I was in fear.' "

Further, there was one statement that was attributed to both Boyer and his wife:

> The Boyers say they were tired of living in fear and went to a lawyer who discovered anti-trust law violations and went to the attorney general.

Eventually, the criminal charges and the civil suit against Punturo were dismissed. Thereafter, Punturo filed the present defamation action, arguing that the various statements to the news media that he had committed antitrust violations and extortion were defamatory and that he is entitled to damages. Kern, Boyer, and Kort all claimed that the fair-reporting privilege protected such statements. Relying on *Bedford v Witte*, 318 Mich App 60 (2016), the trial court concluded that the privilege was not applicable. However, it denied both parties' motions for summary disposition, ruling that there were questions of fact concerning other aspects of the defamation claim, and the Court of Appeals affirmed. *Punturo v Kern*, unpublished per curiam opinion of the Court of Appeals, issued October 16, 2018 (Docket Nos. 338727, 338728, and 338732).

A defamatory communication is "one which tends so to harm the reputation of persons . . . as to lower them in the estimation of the community or to deter others from associating or dealing with them." *Locricchio v Evening News Ass'n*, 438 Mich 84, 115 (1991) (cleaned up). Such a claim requires proof of four elements:

> (1) a false and defamatory statement concerning the plaintiff, (2) an

unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. [*Smith v Anonymous Joint Enterprise*, 487 Mich 102, 113 (2010) (quotation marks and citation omitted).]

The issue before this Court is the second element of the defamation claim: whether defendant's communications are "privileged," specifically with regard to the fair-reporting privilege under MCL 600.2911(3), which provides in part:

[D]amages shall not be awarded in a libel action for the publication or broadcast of a fair and true report of matters of public record, a public and official proceeding, or of a governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body, or for a heading of the report which is a fair and true headnote of the report.

MCL 600.2911(3) further provides:

This privilege shall not apply to a libel which is contained in a matter added by a person concerned in the publication or contained in the report of anything said or done at the time and place of the public and official proceeding or governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body, which was not a part of the public and official proceeding or governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body.

Thus, to be afforded the protections of the fair-reporting privilege, the statements must constitute: (1) a "fair and true report" (2) that pertains to "matters of public record," "a public and official proceeding," or a "record generally available to the public." MCL 600.2911(3). There is no dispute that Boyer and Kort's lawsuit, and in particular their complaint, against Punturo alleging antitrust violations and extortion satisfied the second prong of this privilege. The question then turns on whether the statements by Kern, Boyer, and Kort constituted "fair and true reports" of the lawsuit, in particular, of its complaint alleging antitrust violations and extortion.[2]

The Court of Appeals has previously explained what entails a "fair and true report":

---

[2] The parties do not dispute that this case involves a "libel action," as required under the statute. MCL 600.2911(3).

The information obtained and published must substantially represent the matter contained in the court records. This Court has held that such a standard is met, and a defendant is not liable, where the "gist" or the "sting" of the article is substantially true, that is, where the inaccuracy does not alter the complexion of the charge and would have no different effect on the reader than that which the literal truth would produce, absent proof that such variance caused the plaintiff damage.

Under this test, minor differences are deemed immaterial if the literal truth produces the same effect. To determine whether the plaintiff carried the burden of showing material falsity under the substantial truth doctrine, this Court must independently review the entire record. [*Northland Wheels Roller Skating Ctr, Inc v Detroit Free Press, Inc*, 213 Mich App 317, 325-326 (1995) (quotation marks, citations, and emphasis omitted).]

Thus, to determine whether the reports here are both "fair and true," one must consider the context in which the statements were made and compare those statements to the underlying complaint. See *Smith*, 487 Mich at 129 (2010) ("[A]llegedly defamatory statements must be analyzed in their proper context.").[3] If the statements substantially represent what is set forth in the complaint, then defendants have provided a "fair and true report" of the official proceeding. That is, such statements were "true" to the complaint. Upon review of the underlying complaint, it is clear, in my judgment, that the statements to the news media were nearly word-for-word recitations of the allegations in the complaint. The complaint details the underlying facts and circumstances of the case,

---

[3] Punturo argues that the statements from Kern and his clients were not "reports" at all. "Report" is defined as a "detailed account or statement." *Merriam-Webster's Collegiate Dictionary* (11th ed). Kern's and his clients' statements to the news media were "detailed accounts or statements" on the lawsuit against Punturo. Even if a "report" must be officially reported-- for instance, in a news outlet-- certainly the statements here meet this standard because they *were* reported in the news media. What the statute does not do, as it has in previous versions, is to protect news reporters *exclusively*. Compare MCL 600.2911(3), as enacted ("No damages shall be awarded in any libel action *brought against a reporter, editor, publisher, or proprietor of a newspaper* for the publication in it of a fair and true report of any public and official proceeding . . . .") (emphasis added), with the current version of MCL 600.2911(3) ("Damages shall not be awarded in a libel action for the publication or broadcast of a fair and true report of matters of public record, [or] a public and official proceeding . . . ."); see also *Amway Corp v Proctor and Gamble Co*, 346 F3d 180, 189 (CA 6, 2003) (Schwarzer, J., concurring) ("[A]s amended, . . . [MCL 600.2911's] protection extended to anyone against whom damages might be awarded in a libel action for a publication or broadcast, not simply members of the newspaper trade."). For these reasons, I find Punturo's argument unavailing.

including the assertedly inappropriate comments that Punturo made to Boyer and Kort throughout their dealings. Most significantly, the complaint asserts in no uncertain terms that Punturo sought to extort them. For instance, the complaint stated, "Through threats of physical, financial and reputational harm to Plaintiffs, [Punturo] coerced and extorted Plaintiffs . . . ." Further, the complaint stated that Punturo "received, as proceeds of extortion . . . , over $35,500 in cash from Plaintiffs." And it claimed that Punturo engaged in "threats, coercion, extortion, [and] antitrust violations . . . ." Indeed, the complaint sets forth statements that can only be viewed as more harmful than what was allegedly reported to the media. For example, according to the complaint, Punturo said, "You instilled this hatred within me, you defaulted on your agreement to abate me, and now you will realize my resolve to witness your demise." And it further claimed that Punturo exploited Boyer's need for chemotherapy treatments as "a point of leverage to compel the payment of extortion money . . . ." Overall, defendants' statements to the media substantially align with the allegations in the complaint. There are numerous declaratory sentences in the complaint that are nearly identical to the statements subsequently provided to the media. These statements had substantially the same effect as if the complaint itself had been published in the news media or as if each statement to the media had effectively been preceded by, or couched within the semantic context, "We allege in our complaint . . . ." For that reason I would conclude that the fair-reporting privilege does protect defendants' statements to the news media as "fair and true" reports of the official proceeding to which they pertain.

Also for this reason, I do not believe defendant's statements constitute "matter added by a person concerned in the publication . . . which was not a part of the public and official proceeding . . . or record generally available to the public . . . ." MCL 600.2911(3). The statements align with the underlying allegations in the complaint, and thus nothing was "added." By the proposition of not "adding" new matter, I do not believe that the statute is intended to refer to the force or dynamism or degree of emphasis brought to bear by the person making the statement, but rather to the terms and provisions of the substantive public record. The Court of Appeals here relied on *Bedford* to hold that the privilege did not apply because the statements were made "with certainty" (a specific point of emphasis the Court repeated throughout its opinion) and thus went beyond the public record. While I cannot fault that court for following its own published precedent, I respectfully disagree with a significant element of that precedent, in particular, *Bedford*'s assertion that a statement goes *beyond* the public record when it is merely uttered with "certainty."

In *Bedford*, the defendants were attorneys who had filed a complaint in federal court on behalf of their clients alleging, *inter alia*, a violation of the Racketeer Influenced and Corrupt Organizations Act, 18 USC 1961 *et seq.*, and malicious prosecution. *Bedford*, 318 Mich App at 63. One of the attorneys who filed the lawsuit spoke to a reporter for a CBS affiliate in an interview and proclaimed that "we can say with certainty" that the defendants (the plaintiffs in the subsequent defamation action) had

broken the law by obstructing justice, committing bribery, and perpetrating mail and wire fraud. *Id*. In the subsequent defamation action, the plaintiffs argued that the attorneys had knowingly and maliciously made false statements against them to the media in the television interview. *Id*. The attorneys' defense was that the statements had been protected under the fair-reporting privilege. *Id*. at 65-66. *Bedford* held:

> As noted in *Amway* [*Corp v Proctor & Gamble Co*], 346 F3d [180, 187 (CA 6, 2003)], "[t]he statute excepts from the privilege libels that are not a part of the public and official proceeding or governmental notice, written record or record generally available to the public." In this case, viewing the defamation complaint in the light most favorable to plaintiffs, [the attorney's] comments did not merely summarize what was alleged— but not yet adjudicated—in the federal complaint. He stated that "we can say with certainty" that plaintiffs broke the law in various ways. Given the level of certainty expressed, we conclude that his words did alter the effect the literal truth would have on the recipient of the information, and thus the "fair and true" standard in MCL 600.2911(3) was not satisfied. *Northland Wheels*, 213 Mich App at 325. These statements went beyond the public record. See *Amway*, 346 F3d at 187. Accordingly, defendants were not entitled to claim the fair-reporting privilege with regard to the television interview . . . . [*Bedford*, 318 Mich App at 71.]

In my view, the "certainty" principle established in *Bedford* is nowhere grounded within the statute.[4] Rather, the statute only requires the allegedly libelous statements to constitute "fair and true" reports of the proceedings. MCL 600.2911(3). There is no requirement that an attorney or litigant qualify his or her own statements by explicitly prefacing them as only "allegations," for they quite obviously are only allegations. Rather, the statements viewed in the required statutory context need only align with what has been set forth in the complaint. The Court of Appeals in both *Bedford* and in this case failed to take into account the self-evident context in which defendant's statements were made. They were made during interviews regarding an ongoing lawsuit, and the reasonable reader or listener of such statements is fully equipped to comprehend that these statements were mere allegations, just as all lawsuits until adjudicated are composed of mere allegations. Having to assess the "level of certainty," or the quantum of certainty or tentativeness, expressed in every such statement would give rise to an increasingly vague and arbitrary rule that would leave many litigants and their attorneys open to confusion and uncertain liability whenever they speak to the media about an ongoing lawsuit. Moreover, such a standard would have the effect of potentially

---

[4] Which is not to say that the exercise of good lawyerly judgment and professionalism would not generally counsel reasonably measured and tempered characterizations of a client's claims.

"chilling" speech on the part of any person who reports on an official or public proceeding. "The special protected nature of accurate reports of judicial proceedings has repeatedly been recognized," and "the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." *Cox Broadcasting Corp v Cohn*, 420 US 469, 492, 495 (1975). Simply put, I believe the statements here were "true," in the sense that they accurately reflected the nature of the allegations made by defendants, and they were "fair," in the sense that any reader or listener would clearly understand that these were merely allegations made in the course of a lawsuit. Thus, I believe these statements fall readily within the ambit of protections of the fair-reporting privilege. I would therefore reverse the judgment of the Court of Appeals and remand to the trial court for entry of an order granting summary disposition to defendants.

ZAHRA and BERNSTEIN, JJ., join the statement of MARKMAN, J.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

December 11, 2020



Clerk

t1208